IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 8, 2008 Session

## ANDRE BLAND v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-20147    W. Fred Axley, Judge**

**No. W2007-00020-CCA-R3-PD  - Filed April 3, 2009**

Capital Petitioner, Andre Bland, appeals as of right the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief. On February 12, 1994, the Petitioner was convicted of first degree murder, attempted aggravated robbery, especially aggravated robbery, and attempted first degree murder. The Petitioner was sentenced to death for the first degree murder. The trial court imposed an effective fifty-year sentence for the convictions of attempted aggravated robbery, especially aggravated robbery, and attempted first degree murder. The Petitioner's conviction for first degree murder and the accompanying sentence of death were affirmed on direct appeal. *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998). On July 16, 1998, the Petitioner filed a petition for post-conviction relief. The trial court appointed private counsel; however, the Office of the Post-Conviction Defender undertook efforts to gain appointment as counsel of record. This court, in an order filed September 14, 1998, directed that the trial court appoint the Office of the Post-Conviction Defender as counsel of record for the Petitioner. The trial court entered a preliminary order, concluding that the petition stated a colorable claim and directed that an amended petition be filed. Before an amended petition was filed, the trial court removed the Office of the Post-Conviction Defender as counsel of record due to counsel's failure to appear on scheduled court dates. The trial court appointed new private counsel, and an amended petition was filed on February 17, 2006. A hearing was conducted on February 20-24, 2006, and April 17-18, 2006. By order entered November 28, 2006, the trial court denied the post-conviction petition. On appeal to this court, the Petitioner presents a number of claims that can be characterized as challenges to the effective representation of trial counsel. Following a thorough and exhaustive review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Michael E. Scholl and Marty McAfee, for the appellant, Andre Bland.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael Moore, Solicitor General; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The proof, as set forth in our supreme court's decision, established the following:

The evidence presented at the guilt phase of the trial established that on the evening of October 9, 1992, the [Petitioner], then nineteen years old, along with Darryl Bailey, Martell Pollard, Carlos Sanders, and two men known only as Steve and Yogi, attended a crap game at the apartment of Charles Sanders in the Southbrook Apartment Complex in Memphis. When the crap game ended around 10:00 p.m., these young men wandered outside and, at some point between 10:30 and 11:30 p.m., decided to rob two strangers, Earnest Norman and Marcel Nugent, whom they had seen arriving at the complex earlier. Nugent had come along to the complex with Norman to visit a friend. Norman and Nugent both testified that when they arrived, four to six men were standing around in the parking lot, and as they were nearing Norman's car to leave about thirty minutes later, the group of men approached them, asked who they were, where they were from, and whether they had any money. When Norman and Nugent ignored the group of men, one of the [Petitioner's] party struck Norman in the back of the head as he was about to get into his car. Norman fled. As he ran, Norman realized he was being pursued by one of the men, and he heard someone urging another person to shoot, and then heard a gun fire. Norman escaped unhurt to a nearby service station and called 911.

In the meantime, Nugent, who had locked himself inside Norman's car, found himself trapped and surrounded by the group of men as they tried to force him out of the car. About this time, the victim of the murder, twenty-year-old Ontrain (Terry) Sanders, drove into the parking lot, got out of his car, and approached the men surrounding Nugent. According to Nugent, the men said something to Sanders, who turned and headed back to his car without replying. The [Petitioner] then fired a gun, hitting Sanders in his right leg. Bleeding profusely, Sanders fled some 273 feet, almost 100 yards, through the apartment complex. The [Petitioner] and Darryl Bailey jogged after Sanders who was limping from the leg injury. When, during the chase, the [Petitioner] shot Sanders in the leg again, Sanders attempted to hide under a pickup truck. However, Sanders was discovered and the [Petitioner] shot him at least two or three more times while he lay underneath the truck. The [Petitioner] and Darryl Bailey then left Sanders, under the truck, pleading for help, and ran back around the apartment complex to the car where Nugent was trapped.

-2-

Upon hearing gunfire, Henry Adams, who lived in an upstairs apartment, looked out his back door and saw a man with a large shiny gun kneeling down as if shooting under the truck. Adams heard three shots fired, then saw the man with the gun turn and run. Hearing a man screaming, "Oh God, please help me," Adams called 911 just after midnight. When Adams returned to his back door to look out into the parking lot, he saw someone trying to crawl out from underneath the pickup truck, and heard the person yelling and pleading for help for a short while longer.

Floyd P. Johnson owned the green pickup truck under which Sanders had taken refuge, and Johnson's upstairs apartment also overlooked the area in which the shooting occurred. Johnson testified that after hearing three gunshots, he looked out his window and saw a man lying partially under his truck with his upper body exposed and covered in blood. Johnson testified that the man was calling out, "Oh God, help me!" Because he feared for his own safety, Johnson stayed on his balcony, but attempted to calm Sanders down by talking to him and encouraging him to remain still. Johnson said he talked with Sanders for ten or fifteen minutes until the ambulance arrived.

While Sanders fought for his life under the truck, the [Petitioner] and Darryl Bailey returned to Norman's car. Bailey helped the group of men break through the passenger window and pull Nugent from the automobile. Nugent scuffled with the men before breaking free. As Nugent fled, his jacket was pulled off his back. According to Martell Pollard when someone shouted, "he has a gun," the [Petitioner] shot Nugent in the leg. The men then took his watch and his money, kicked him, beat him, and finally, the [Petitioner] again shot Nugent in the leg. The group of men then disbanded, leaving Nugent lying in the parking lot. Nugent made it upstairs to the apartment of Norman's friend, where he waited until an ambulance arrived.

The first ambulance on the scene transported Sanders to the hospital. One of the paramedics testified that the unit arrived nine minutes after receiving the call, but Sanders' condition was very grave at the time of their arrival. Sanders died in the ambulance on the way to the hospital.

Two days later, at the urging of his mother and grandmother and after learning that the police were looking for him, the [Petitioner] turned himself into the Memphis Police Department on the afternoon of October 12, 1992, approximately two days after the killing. At that time, the [Petitioner] gave a statement in which he confessed to shooting Nugent and Sanders with a chrome 9-millimeter pistol. The following is the defendant's account of the crime:

> Me, Little Darryl, Carlos' daddy, Carlos, and a guy named Pat were
> shooting dice. We were inside Carlos Sanders' house inside the
> Southbrook Apartments. Little Steve knocked on the door and he

came out and got the 9-millimeter pistol that I had. By that time I got up and came outdoors and got the gun from Little Steve. And Yogi approached me saying he was fixing to rob dude that was up in the house. Carlos, Martell, Yogi, Darryl, Steve and me were standing out there, and Yogi was telling us he was going to rob the dude. I gave him the gun, the 9-millimeter. By that time the dudes had come out the apartment. Yogi approached him saying something to him, and then they got into physical contact. Then he hit the dude and the dude broke loose and ran. The other dude got in the car and locked himself in. Steve and Darryl grabbed objects from the ground and started hitting the car window. Darryl pulled the dude up out of the car. Steve, Yogi, Darryl, Carlos, Martell, they was hitting the dude with objects they picked up. I got the gun back from Yogi, and the dude in the Cadillac [the victim] drove up and jumped out and started towards us. And then I shot him in his leg. Then he went around the building and I went around the building and shot him in his leg again. And then he had tried crawl up under a truck and I shot him again. Then he continued up under the truck. I went back around the corner, and they was continuing to beat the dude that got out of the car. Then I walked up and shot in both his legs. I wasn't shooting to kill, that's why I shot them in their leg. I turned around, threw the gun and ran to the Kings Gate Apartments over to my girlfriend house, Teresa Wiggs . . . and then we went to sleep.

When asked by the police why he shot Sanders the first time, the [Petitioner] replied, "Because when they was beating on the dude, he jumped out and approached us and said, 'What's up?' And I turned around and I shot him in his leg." The [Petitioner] said that he shot Nugent "so he couldn't get away." The [Petitioner] denied getting any money or valuables from either Sanders or Nugent or being involved in the robbery. He knew the other men "went in the dude pockets" but did not know if they got anything. Nugent, however, testified that he was robbed. In addition, police found an unemployment check, a bloody dollar bill and assorted change, keys, and a black cap near the pickup truck where Sanders was killed. Sanders' wallet was also missing and never found.

Dr. Sandra Elkins, a forensic pathologist who had performed the autopsy on Sanders, testified that the cause of his death was multiple gunshot wounds, one of which lacerated his femoral artery and caused him to bleed to death. Dr. Elkins found nine separate gunshot wounds to the victim's right leg, extending from the groin area of the upper thigh to just above the knee, which included both entrance and exit wounds. From the combination of entrance and exit wounds, Dr. Elkins deduced that the victim had actually been shot four or five times. A person with the victim's injuries, Dr. Elkins testified, could live from two to fifteen minutes and be conscious

-4-

four to five minutes after suffering such a wound.

Based upon the proof summarized above, the jury found the [Petitioner] guilty of first degree premeditated murder, especially aggravated robbery, attempted first degree murder, and attempted aggravated robbery.

The trial proceeded to the sentencing phase on the conviction for first degree murder. The State presented two witnesses. Dr. Elkins again testified that someone with the victim's injury could live from two to fifteen minutes and be conscious up to four to five minutes. Since the victim's femoral nerve had only been bruised and not severed, and because the muscles and nerves of his right thigh had been completely destroyed, Dr. Elkins testified that the victim would have experienced pain from the wounds in his leg during the time he remained conscious.

The second State witness was the victim's mother, Vivian Lewis, a deaf mute who testified through an interpreter. She testified that her son was sweet and good and had never been in any trouble. She said that the victim's two small daughters, two-years-old and four-years-old at the time of trial, were "very, very worried" and wanted to see their father. Lewis also testified that her son's murder had left his family "very, very hurt."

The defense presented three witnesses: the [Petitioner's] mother, Marilyn Boyd; his maternal grandmother, Virginia Bland; and the [Petitioner] himself. The [Petitioner] had never known his father and was raised by his mother and grandmother, who both testified that he had turned himself into the police at their urging. The [Petitioner] had dropped out of high school in the eleventh grade, when he was suspended for being "disrespectful to a teacher." He had a juvenile record beginning at the age of eleven, consisting of multiple assaults and batteries, car thefts, and at least one drug conviction. The [Petitioner] testified that he shot the victim because the victim ran back to his car as if he was "fixing to get his gun or something;" that he did not know why he and Darryl had followed the victim; that he had been drinking and the crime was a spur of the moment decision; and that the victim was shot several times because the automatic gun "kept on repeating shots." He expressed remorse and repeated that he was not trying to kill the victim: "[t]hat's why I shot him in the leg." The [Petitioner] also admitted that he carried a gun because he sold drugs and that he had been selling drugs on the night of the killing. During closing argument, counsel for the [Petitioner] stressed his youth, lack of education, and single parent upbringing.

Based on the proof, the jury determined that the State had proven the existence of one aggravating circumstance beyond a reasonable doubt: "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." [T.C.A.] § 39-13-204(i)(5) (1991 Repl. & 1996

Supp.). In addition, the jury found that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt, and as a result, sentenced the [Petitioner] to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the [Petitioner], we affirm the judgment of the trial court and Court of Criminal Appeals.

*Bland*, 958 S.W.2d at 656-59.

## Proof at Post-Conviction Hearing

At the post-conviction evidentiary hearing, the following proof was presented and is summarized as follows.

Sergeant Debra Lynn Oliver-Hammons testified that she is the supervisor of the keeper of the records for the jail. Sergeant Oliver-Hammons related that she was asked to compile the records of the Petitioner from October 12, 1992, through March 31, 1994. During this period, there were no records that either of the Petitioner's trial attorneys had visited him in the jail. The jail records did, however, reflect several visits. Specifically, the Petitioner had visitors on October 24, 1992, at 9:55 a.m. and on November 3, 1992, at 7:39 p.m. She added that they do not specifically log attorney visits, but, rather, they just log visits. She clarified that it is only after the event that they would go back and put their own documentation within the history. Sergeant Oliver-Hammons further testified that, during this time period, the Petitioner had five disciplinary records. She added that, to her knowledge, none of these infractions were for major fights or violent encounters.

Robert D. Davenport testified that he is an inmate in the Tennessee Department of Correction, where he is serving a forty-six year sentence for especially aggravated robbery. Mr. Davenport explained that the Petitioner was his co-defendant and that he testified at the Petitioner's trial.

Recalling the events leading to the crime, Mr. Davenport related that he and the Petitioner went to the apartment of Charles "Winky" Sanders. Many other people were at Winky's apartment, including a man named Steve, a man named Larry, a man named Martia, a man named Carlos, and a man named Darryl. Carlos was Winky's son. The men were shooting craps, and there was some discussion about a robbery. Mr. Davenport stated that the Petitioner was not involved in the robbery discussion. At some point, "[t]wo young dudes pull up in a car, Carlos, Steve and the rest of them, they jumped on dude and the man ran. At that point in time another man pulled up in a Cadillac." Mr. Davenport identified the person in this Cadillac as the person who was shot and killed. Mr. Davenport stated that the Petitioner was not among the men who jumped on the two guys in the first car. However, he stated that the Petitioner did confront the man in the Cadillac, and they had words. He stated that "a shot [was] fired . . . everybody started running."

Mr. Davenport testified that he never talked with the Petitioner's attorneys. He averred that

he told his attorney the same scenario of events prior to his own trial.

Darryl Bailey, another of the Petitioner's co-defendants, stated that he was currently incarcerated on a drug possession conviction. Regarding the crimes for which the Petitioner was convicted, Mr. Bailey stated that he was initially found guilty and sentenced to life imprisonment. However, the case was remanded for a new trial by the Court of Criminal Appeals, and, upon remand, Mr. Bailey was found not guilty.

Mr. Bailey related that the alleged crimes took place at the Southbrook Apartments on Winchester. On the date of the murder, a bunch of men had congregated at Carlos Sanders' apartment and were "shooting dice." There was some discussion of a robbery. Mr. Bailey stated that the Petitioner was not involved in this discussion. He explained that, after the robbery was planned, two "dudes come over going to see some lady" and "the robbery went on. . . ." He stated that, as they were fighting with these two men, a Cadillac pulled up and the Petitioner became involved in a confrontation with the driver of the Cadillac.

Steve went to him and told him well, you need to get back in your car. So when he – when he got out of the car he closed the door, so by that time Steve was like well, you need to get back in your car and leave, you know.

And so when he go open the door we didn't know if he was going to pull a pistol or was he fixing to leave or what, you know what I'm saying, and, you know–
. . .

Well, at that time after [the Petitioner] had come out the house he shot him in the leg, so and they looked – they went on around the corner, they limped with dude that got shot in the leg he limped on around the corner, he went – you know, went around the corner with him. That's all I had seen.

According to Mr. Bailey, the Petitioner followed the man around the corner. Mr. Bailey then heard more gunshots. Mr. Bailey denied that the Petitioner had any involvement in the initial discussion regarding the robbery and denied that the Petitioner was present when the first two men were attacked. Mr. Bailey admitted that he had initially attempted to "cover up for [the Petitioner]," explaining that the Petitioner is his best friend. He added that the Petitioner's attorney never talked with him. He also said that, had someone attempted to speak with him, he probably would not have talked with them.

Janann McInnis, an investigator and document specialist with the Office of the Post-Conviction Defender, testified that she has been involved in this line of work since 1989. She explained that records are important to developing a mitigation theory in capital cases and that one should locate any records on a defendant and his family. The goal is to go back at least three generations to show a pattern of family history. The records sought are usually medical records,

psychological records, and school records. She added that there would also be a need to get any police records, military records, former prison records, and any record that has ever been generated about a defendant or his family. Ms. McInnis reiterated that family records are important because they could show a history of mental illness, incarceration, or learning disabilities. Ms. McInnis stated that, in order to obtain these records, one would first request them by letter. The information as to where to look for records would be derived from conversations with a defendant and his family. School records will reveal what type of student a defendant was. Absenteeism is another indicator of problems. School records are also crucial in determining mental deficiencies. Ms. McInnis stated that, in Tennessee, she has never had a problem obtaining requested records by letter and releases.

Ms. McInnis recognized that the Office of the Post-Conviction Defender was initially appointed to represent the Petitioner in his post-conviction efforts. In this regard, Ms. McInnis started researching and requesting records in May 1998. At this point, she recalled that some of the public records had already been requested by the District Attorney's Office and the police. Ms. McInnis met with the Petitioner's family, including his mother and his grandmother, and garnered a preliminary social history from the Petitioner.

Ms. McInnis also gathered the Petitioner's social file from juvenile court. The file basically contained the legal charges filed against the Petitioner and his siblings. She stated that she also requested the records of Mitchell Boyd, Sr., the Petitioner's stepfather.

Ms. McInnis testified that she compiled a file with photographs of the Petitioner as a child and a teenager. She stated that the purpose of such a file was to show that the Petitioner was a normal child who went to school. The file was also to show whether the Petitioner had a problem with birth defects or fetal alcohol syndrome. Finally, Ms. McInnis stated that such a file was important because the photographs tend to humanize a defendant.

Ms. McInnis also had possession of the school file and records of the Petitioner's half-brother. The records of a sibling are important because they can establish a pattern, such as a need for special education. She had a file on the Petitioner's mother, containing her birth certificate, a letter from the Metropolitan Police Department regarding her husband, Mitchell, and a marriage license. Ms. McInnis explained that the Petitioner's stepfather, Mitchell Boyd, Sr., was murdered in Washington, D.C. The murder occurred after he had been released from federal prison. Ms. McInnis also had the academic record of the Petitioner's maternal uncles, Rodney Bland; Ricky Bland; Larry Bland; Terry Bland; and Travis Bland. Ms. McInnis had obtained school records of the Petitioner and his brothers, Mitchell and Perinta. She also had the school records of the Petitioner's maternal aunt, Sandra Bland.

Medical records on the Petitioner from Methodist Hospital dated October 3, 1991, indicated that the Petitioner received injuries requiring medical attention. The Petitioner was eighteen years old at the time of the injuries. The Petitioner was nineteen years old at the time of the crimes. The injuries sustained in October 1991 were gunshot wounds to the posterior thigh. Another record from December 26, 1989, reflected that the Petitioner was hospitalized for multiple facial fractures.

Ms. McInnis obtained information on Charles Edward Robertson, the Petitioner's biological father. After obtaining all of this information, she was able to develop a mitigation theme for the Petitioner. Specifically, she stated:

> [The Petitioner] was a child that lived with his mother sometimes, with his grandmother sometimes. [He] lived in a family that his stepfather had a criminal history. His father, early on, was very active in his life until he reached . . . mid early age he would see his natural father.

Ms. McInnis described "mid early age" as ten or eleven. She explained that Mitchell Boyd, Sr., the Petitioner's stepfather, was the foremost male role model in the Petitioner's life. Mitchell Boyd, Sr., was a drug dealer, a member of a Memphis drug cartel. Mitchell Boyd, Sr., was a local distributor of drugs for the cartel, as was his mother, Peggy Boyd. They distributed cocaine on a "very large scale."

Ms. McInnis testified that she was unable to have the Petitioner's mental health or intelligence quotient tested. However, based on his grades from the school records, she believed that there possibly was a problem and that he may have had a minor mental deficiency. She added that there was some testing by the juvenile court, which indicated a very limited mental ability. She opined that the evidence she discovered indicated that further investigation was needed.

Regarding school records, Ms. McInnis explained that the Memphis City School system had a division of Disciplinary and Suspension Expulsion Program. She explained that these records are destroyed when a student reaches the age of twenty-one years. She further explained that, since the Petitioner was nineteen years old at the time of the crimes, these records would have been available had they been requested. The records would have included expulsionary reports, which may have led to something else.

The Petitioner's school records further indicated that the Petitioner had attended numerous schools and that he had moved several times. Ms. McInnis related that this was significant because "[g]oing into a new school is difficult [in] any circumstance, and I believe that he probably had his most difficult time when he went to Shelby County Schools because he lived in an area that was predominately white; and even some of the teachers were . . . they just weren't happy that maybe there were black students living there." She explained that the family was living in Germantown and that they "were about the only African-American people living there." The Petitioner's family was supportive of him, and Ms. McInnis found them to be very cooperative.

Richard David Roleson, a retired Memphis Police Officer, testified that he served on the police force for thirty-three years. He explained that officers were trained where to shoot a person; specifically, they were taught to shoot two bullets to the chest and one to the head. In other words, the center mass of a person was the proper place to shoot a person because a wounded person can still kill you. A person shot in the leg was more likely to be wounded than to suffer a fatal wound. Mr. Roleson explained, however, that by shooting a person in the leg, the femoral artery could be

damaged and result in death.

Virginia Bland, the Petitioner's grandmother, moved to Memphis, Tennessee, from Senatobia, Mississippi, in 1953. Ms. Bland lived in the LeMoyne Gardens area of Memphis. She described the neighborhood as great; "[n]obody bothered us or did nothing. And [in the eighties], it started getting violent." She explained that people then began to sell drugs in the neighborhood and that she started hearing gunshots. Virginia Bland stated that this was the neighborhood in which the Petitioner lived when he was born. She explained that, at the age of seven, the Petitioner moved from the neighborhood to a house in Whitehaven. The Boyd family then moved to Germantown. The Petitioner continued to visit Virginia Bland in Lemoyne Gardens.

Virginia Bland stated that the Petitioner was "doing great" while they lived in Germantown. The family had plenty of money, and the Petitioner was doing well in school and staying out of trouble. At some point, Mitchell Boyd, Sr., was arrested and sent to federal prison. When the Petitioner was approximately fifteen years old, he moved in with Virginia Bland. LeMoyne Gardens was no longer a nice neighborhood. The Petitioner's mother had an apartment in the Briarsgate Apartments. Virginia Bland described the apartment complex as a location for drug sales, prostitution, burglaries, and shootings. Virginia Bland observed that, when the family moved back into this area, the Petitioner began getting into more and more trouble. She described an incident in which the Petitioner "was actually assaulted, pistol whipped. . . ." He was badly hurt and was taken to the hospital. On another occasion, the Petitioner was shot in both of his legs and was hospitalized. The Petitioner told Ms. Bland that this "made him feel bad. . . ." She opined that the Petitioner was frightened by these incidents. Another time, the Petitioner discovered a dead body in the apartments and reported this incident to the police. The Petitioner was initially arrested for this murder, but the charges were dropped.

Regarding the present case, Virginia Bland stated that she first learned of the Petitioner's involvement when police knocked on her door one night as they slept. The police were looking for the Petitioner, who was not at home at that time. He turned himself in three days later. Before turning himself in, the Petitioner returned to his grandmother's home, and she made him something to eat. The Petitioner related that he was sorry for what he had done to the victim and that he "did not mean to do that." Ms. Bland related that the Petitioner realized that he was going to be punished for what had done.

Virginia Bland stated that she visited the Petitioner between forty and fifty times before he went to trial and that she met the Petitioner's's attorney, William Johnson. She stated that William Johnson never visited her at her house, but she did meet with him at his office on one occasion. The only other times she saw Mr. Johnson were in the courtroom. Virginia Bland stated that only she and the Petitioner's mother, Marilyn, talked with Mr. Johnson at his office. She recalled Ms. Patricia Odell, who was also the Petitioner's attorney, telling them that she had never tried a capital case. She recalled that Mr. Johnson informed them that there was an offer for a plea agreement on the table for life in prison, plus thirty years, but she explained that Johnson did not explain what this meant. She was not asked to discuss this proposal with the Petitioner. Notwithstanding, Ms. Bland

did discuss the plea offer with the Petitioner during the trial, and he agreed to take the offer of life plus thirty years. However, the attorneys said that it was too late to accept the plea offer.

Virginia Bland testified that the Petitioner had dated Teresa Wiggs for three years before the crimes, but she did not know that Ms. Wiggs was pregnant with the Petitioner's child at the time of his arrest. Ms. Wiggs had the child before the Petitioner's trial. Virginia Bland would have been able to locate Ms. Wiggs for the trial.

Virginia Bland stated that Mr. Johnson did contact her and ask her to testify at the Petitioner's trial. However, Mr. Johnson did not meet with her before she testified. She stated that neither Mr. Johnson nor an investigator made inquiry into the Petitioner's life.

Virginia Bland stated that, at the time of the Petitioner's arrest, he was living with her in her apartment. Virginia Bland described the neighborhood as low income. The apartment consisted of three bedrooms, two bathrooms, a hall, a kitchen, a dining room, and a living room. Virginia Bland resided in the apartment with her eight children and three of her grandchildren. She was not aware that the Petitioner carried a weapon or that he sold drugs.

Marilyn Boyd, the Petitioner's mother, testified that the Petitioner's father was Edward Charles Robinson. Edward Robinson, who was involved in the Petitioner's life when he was a young child, died in 2003 of cirrhosis. Marilyn Boyd testified that Edward Robinson sold marijuana and had an alcohol problem. She stated that, before his death, Edward Robinson visited the Petitioner in jail.

Marilyn Boyd grew up in Lemoyne Gardens. During her childhood, it was a nice neighborhood. She left LeMoyne Gardens in 1983, when the Petitioner was ten years old, and the family moved to the Whitehaven area. At that time, Marilyn Boyd was married to Mitchell Boyd, Sr. Marilyn Boyd stated that Mitchell Boyd Sr. was a successful drug dealer in Memphis and provided for his family very well. In 1985, the family moved into a two-story home in Germantown, Tennessee. The home cost $200,000 in 1985. The Germantown neighborhood was very nice with no drugs, no crimes, and no prostitutes. The family lived in the Germantown neighborhood for three and one-half years. The Petitioner did not attend Germantown schools but remained at Whitehaven Elementary. Marilyn Boyd explained that her children did not want to change schools.

Marilyn Boyd stated that their family did not fit in well in their Germantown neighborhood. She explained that one neighbor did not want the Petitioner to ride his moped on the street. Marilyn Boyd stated that she did not know if this was based upon prejudice. However, the Petitioner later helped that same neighbor get out of a ditch. Marilyn Boyd stated that the Petitioner played with the children living next door.

In 1987, the Petitioner's Uncle Travis was shot. In that same year, Mitchell Boyd, Sr., was arrested, and the family had to leave their Germantown house. The family relocated to a smaller house in the Hickory Hill area, lived there for four years, and then moved back to Whitehaven. The

Petitioner was fifteen years old when the family returned to Whitehaven. The family lost everything they had when Mitchell Boyd, Sr., was arrested. After moving back into the Whitehaven neighborhood, the Petitioner began to get into trouble, his grades began to fall, and he began to struggle in school. Marilyn Boyd stated that she had heard that the Petitioner was selling drugs. The Briarsgate Apartments in Whitehaven were not ideal. Marilyn Boyd described "shooting[s], selling drugs, burglaries, stealing cars, all those types of things, [and] . . . [p]rostitutes, of course."

Marilyn Boyd admitted that her brothers, Travis and Ricky, were "hustling, selling drugs" in the neighborhood at this time. She stated that her husband, Mitchell Boyd, Sr., went to federal prison for selling drugs on a "big time scale." Mitchell Boyd, Sr., was later murdered in Washington, D.C. The murder was related to someone he met while he was incarcerated.

Marilyn Boyd stated that Teresa Wiggs was the Petitioner's girlfriend and the mother of his child. She stated that she could have easily located Ms. Wiggs if asked by the Petitioner's attorneys. Marilyn Boyd stated that she only met with the Petitioner's counsel twice, once at Mr. Johnson's office and then in the courtroom. Marilyn Boyd, her mother, and Marilyn's brother, Travis, went to Mr. Johnson's office. Marilyn Boyd stated that she visited the Petitioner between thirty and forty times while he was in jail. The Petitioner maintained that he did not mean to kill the victim and that he was sorry. She added that the Petitioner did not get into trouble while in jail; he had learned to adapt to jail life.

Marilyn Boyd stated that the Petitioner's counsel never asked her what she would testify to at trial. She was never questioned about her background. Marilyn Boyd stated that she would have asked the jury to spare the Petitioner's life.

Marilyn Boyd admitted that the Petitioner's pistol whipping and later gunshot wounds did not deter him from selling drugs. Marilyn Boyd stated that she was not aware that the Petitioner carried a gun. She also admitted that there were three days between the time the police first came to the house after the crime and the date the Petitioner turned himself in to the police. Marilyn Boyd stated that she discussed the situation with the Petitioner every day.

Irish Rutherford grew up with Marilyn Boyd. She testified that she had known the Petitioner since he was born. She described LeMoyne Gardens during her childhood as "a tribe" where everybody looked after one another. Ms. Rutherford later moved back to LeMoyne Gardens as an adult. She recalled that the neighborhood began to change for the worse during the 1970's. Specifically, more crime was occurring in the neighborhood. Ms. Rutherford stated that she visited the Petitioner numerous times in jail. She described the Petitioner as "a nice young boy." She added that he was sorry for what he had done.

On cross-examination, Irish Rutherford explained that selling drugs was a means of survival. She stated that she was not aware that the Petitioner was selling drugs and carrying a weapon.

Rose Tatum, the Petitioner's aunt, stated that the family was very close. She explained that

she did not see him very often when he moved to Germantown. She maintained, however, that the Petitioner remained respectful to her. Rose Tatum stated that she loved the Petitioner and that she missed him. She stated that the Petitioner feels that he has been rehabilitated. Ms. Tatum testified that the Petitioner's attorneys never contacted her prior to trial and that she would have been willing to testify in front of a jury.

Teresa Wiggs, the mother of the Petitioner's child, was his girlfriend at time of his arrest. At the time of his arrest, she was not aware that she was pregnant. She stated that the baby was born on August 26, 1993, and the Petitioner's trial was in February 1994. Ms. Wiggs testified that their son, DeAndre, had visited his father in prison.

Ms. Wiggs recalled that, on the date of the murder, she was at her home at the Kingsgate Apartments. She stated that she received a telephone call from a person known as Gamall. Gamall informed Ms. Wiggs that law enforcement officers were at the Petitioner's grandmother's house. Ms. Wiggs stated that the Petitioner was not with her at the time and that she did not know where he was. She paged the Petitioner, and he immediately came to her home. Ms. Wiggs asked the Petitioner what happened, and he told her he had killed someone. She described the Petitioner as "acting like something was really, really wrong with him." The Petitioner stated that he was not trying to kill anyone. He added that he shot the man in the leg. Ms. Wiggs stated that the Petitioner cried and kept repeating that "he didn't try to hurt anybody." She related that the Petitioner turned himself in three days later. Ms. Wiggs stated that she was certain that the Petitioner did not mean to kill the man.

Ms. Wiggs stated that she had never known the Petitioner to carry a weapon. She testified that the Petitioner was "nice" to her, "we were always cool," and that he was never violent toward her.

Teresa Wiggs testified that neither Patricia Odell nor Anthony Johnson ever talked with her prior to the Petitioner's trial. She stated that she sent the Petitioner photographs of their son. She added that the Petitioner expressed interest in his son.

Rickey Bland, the Petitioner's uncle, stated that he was only seven years older than the Petitioner. He described their relationship as more like siblings, rather than uncle and nephew. Mr. Bland and the Petitioner lived together in an apartment in LeMoyne Gardens for a period of time. Mr. Bland moved with the Petitioner's family to their Germantown home. He described Germantown as "crime free" and stated that everyone was friendly. Mr. Bland stated that the Petitioner's stepfather, Mitchell Boyd, Sr., "made a lot of money" by selling drugs. Mr. Bland was aware that Mitchell Boyd, Sr., paid for the house and everything else with money obtained from drug sales. While living at the Germantown house, Mitchell Boyd, Sr., owned a Mercedes, a BMW, and a Porsche. Rickey Bland described all of these vehicles as being "custom." He described Mitchell Boyd, Sr., as one of the biggest drug dealers in Memphis. He stated that when Mitchell Boyd, Sr., was convicted and sentenced to federal prison, the family went from "riches to rags." The family moved from Germantown to the Hickory Hill area but eventually had to move into the Briarsgate

Apartments on Winchester. Rickey Bland described the area as "rough." He stated that people often sold drugs on the street corners or "smoked weed" openly. Ricky Bland stated that you always had to be on guard as people were robbed, shots were often fired nearby, homes were burglarized, and other things of this nature.

Rickey Bland stated that he was the youngest of eight children. He testified that he had four brothers. He stated that his brother Travis, who was a drug dealer, was paralyzed as the result of being shot in the back. Another brother, Rodney, who was also a drug dealer, was shot during a carjacking. His brother, Terry, was also a drug dealer. He was shot before the Petitioner's trial. The remaining brother, Larry, did not sell drugs.

Rickey Bland stated that he started selling drugs after the family moved back into the Briarsgate Apartments. He stated that, at this time, the Petitioner neither carried a weapon nor sold drugs. The Petitioner was involved in an incident during which he was "pistol whipped[,]" and the incident scared him. However, the Petitioner continued to stay around Rickey Bland when he was selling drugs. The Petitioner was later shot in the leg. After this incident, the Petitioner realized that he needed to defend himself, and he began carrying a weapon. Rickey Bland explained that everyone carried a weapon. Moreover, he explained the difference in the people who carried guns, killers and non-killers. He stated that "[a] non-killer is a person that will shoot you, but his intention is not to shoot you, meaning . . . he will shoot you from your waist down." "[A] killer . . . he's shooting at your waist and up. He mean to . . . he mean business and he mean to let you know that he mean business."

Rickey Bland stated that, after being shot in the leg, the Petitioner began selling drugs. The Petitioner's stepfather and four of his uncles sold drugs. Rickey Bland explained that none of the women in the family knew that the men in the family sold drugs.

Recalling the day of the murder, Rickey Bland said that he was with the Petitioner the entire day until thirty minutes before the incident. He talked with the Petitioner after the incident and described the Petitioner as heartbroken. The Petitioner was crying and upset over what he had done and wanted to turn himself in to make things right. Rickey Bland stated that he loved the Petitioner with all his heart.

Rickey Bland stated that he never spoke with the Petitioner's attorneys and never met with their investigator. Rickey Bland was present during trial and was available to testify. On cross-examination, Rickey Bland explained that he never discouraged the Petitioner from selling drugs because it was a very profitable business, but he admitted that it was not worth it in the long run because "you" could "get locked up."

Perinta Bland, the Petitioner's brother, stated that he remembered his stepfather, Mitchell Boyd, Sr., going away but did not understand his stepfather's reason for leaving until he was older. As others before him, he described the area of the Briarsgate Apartments as violent and stated that there were drug sales in the area. Perinta Bland stated that he was ten years old when the Petitioner

-14-

was arrested. He also testified that the Petitioner tried to discourage him from the drug trade. Perinta Bland testified that the Petitioner had expressed remorse over the murder. He stated that the Petitioner had been trying to keep him away from crime.

The Petitioner's uncle, Travis Bland, testified that he was very close to the Petitioner. He described himself as the Petitioner's favorite uncle. Travis Bland stated that he sold drugs until he was shot. Travis Bland stated that he was present at the Petitioner's trial, but the Petitioner's attorneys never talked with him. He stated that he would have liked to have had the opportunity to ask the jury to spare the Petitioner's life and to tell them how much the Petitioner was loved. Neither of the Petitioner's attorneys asked him any questions nor did they offer him the opportunity to speak on behalf of the Petitioner.

Carolyn Jackson, a close family friend of the Petitioner, testified that she too lived in LeMoyne Gardens. She described LeMoyne Gardens as a very rough area. She explained "you either had to stay there or go to jail. Because it was like bad on every corner." She stated that there were drugs on every corner. Ms. Jackson testified that she loved the Petitioner.

Ms. Jackson visited the Boyd family home in Germantown. She described the house as "a nice big house" and the neighborhood as very nice. She stated that the neighborhood was "somewhere a big time lawyer would live, maybe like Marvin Ballin or somebody like that." She stated the Petitioner was not a bad kid. The family had nice clothes, nice cars, and plenty of food. Ms. Jackson described Mitchell Boyd, Sr., as a "hustler." She explained that he "sold a little drugs." After Mitchell Boyd, Sr., was arrested and incarcerated, the family could no longer make the payments on the Germantown house so they moved into another house in the Hickory Hill area. Eventually, the family had to move back in with the Petitioner's grandmother in the Kingsgate Apartments. Ms. Jackson stated that this neighborhood was rough. People sold drugs, broke into homes, and had fights, or, as Ms. Jackson stated, things "the average teenager would do."

Ms. Jackson stated that the Petitioner's biological father, Edward Charles Robinson, was an alcoholic and eventually died of cirrhosis. Ms. Jackson stated that it was Mitchell Boyd, Sr., who was the father figure to the Petitioner.

Ms. Jackson testified that, in her opinion, the Petitioner should not be on death row. She was never contacted by the Petitioner's attorneys and stated that she would have done anything to "help Marilyn with her son Andre." She would have asked the jury to spare the Petitioner's life.

Kevin Smith stated that the Petitioner was his best friend. The two men had been friends since they were fourteen years old, meeting each other while the Petitioner lived with his grandmother at the Briarsgate Apartments. He visited the Petitioner at the Germantown house. He testified there was no crime in Germantown and no drug dealers. He stated that he liked to visit the Petitioner's home because they had games and things that teenagers liked. He stated that the Germantown house was beautiful. He did not know how the family afforded such a house. When the family moved back to the Briarsgate Apartments, Kevin Smith and the Petitioner were able to

-15-

spend more time together. This area was crime-ridden, and one could commonly see women prostituting themselves.

Kevin Smith was present when the Petitioner was pistol whipped. He stated that he and the Petitioner were at the home of the Petitioner's girlfriend. The Petitioner was sitting on the couch when "a guy came through the door and . . . just hit him with the pistol." The Petitioner told Kevin Smith, "That was the last time something like that was going to happen." Kevin Smith also recalled the time when the Petitioner was shot in the leg. Kevin Smith saw the man chasing the Petitioner and shooting at him. Kevin Smith did not visit the Petitioner while he was in jail pending trial. He stated that, if asked, he would have testified at the Petitioner's trial.

Sandra Bland, one of the Petitioner's aunts, testified that she was approximately twelve years older than the Petitioner. She stated that the Petitioner's stepfather, Mitchell Boyd, Sr., was a drug dealer. The family had a nice home, nice cars, and nice clothes. Mitchell Boyd, Sr., went to prison for drug convictions and was murdered after he was released from prison. Sandra Bland stated that the Petitioner's primary influence was Mitchell Boyd, Sr., rather than his biological father.

The Petitioner told Sandra Bland that he was sorry about the murder and that he did not intend to kill anyone. The Petitioner's attorneys never talked with Sandra Bland about the Petitioner's life or how she felt about him. No investigator ever came to speak with her. She stated that she loved the Petitioner and that she was willing to testify before a jury.

Toni Bland, the Petitioner's cousin, stated that she was eight years younger than the Petitioner. She recalled when the Petitioner lived in Germantown. She said that the Petitioner and his immediate family had "nice things." She knew that the Petitioner's stepfather was a drug dealer. Toni Bland stated that the Petitioner was "a very nice, kind, loving person." She described him as the joker in the family. She stated that, had she been asked, she would have testified at trial.

Larry Bland, another uncle of the Petitioner, testified that the Petitioner expressed his remorse over the murder before he turned himself in to police. The Petitioner told Larry Bland that he did not intend to kill the man. Larry Bland stated that he loved his nephew. He testified that the Petitioner's attorneys never talked with him but that he was willing to talk with them had they asked. He also would have testified on the Petitioner's behalf.

Jessie Lee Moody, the Petitioner's great aunt, stated that she was aware that the Petitioner's stepfather was a "dope dealer." Ms. Moody stated that the Petitioner was a very respectful child who loved her. Ms. Moody also said that she loved the Petitioner. She stated that she was never contacted by the Petitioner's attorneys but would have cooperated with defense counsel.

Kevin Williams grew up with the Petitioner. Mr. Williams testified that he had gotten into an altercation with the Petitioner at the Briarsgate Apartment. He stated that, as a result of the altercation, he chased the Petitioner and shot him in the leg. After the incident, Mr. Williams asked the Petitioner to forgive him, and the Petitioner did. The two men remained friends after this

incident. Williams stated that he loves the Petitioner as a brother. Kevin Williams told the Petitioner that he did not intend to kill the Petitioner when he shot him.

Mr. Williams stated that the Petitioner's attorneys never contacted him prior to the Petitioner's trial. He stated that he would have been willing to ask the jury to spare the Petitioner's life.

William Johnson stated that he represented the Petitioner at the trial level. Mr. Johnson had tried capital cases prior to representing the Petitioner. He stated that Patricia Odell was first chair counsel. He stated that, although he and Ms. Odell were paid through the court for their trial work, neither of them submitted a bill for appellate work. Mr. Johnson stated that he was appointed October 13, 1993, to represent the Petitioner. He recalled that, at this point, Ms. Odell had already been appointed to the case for some time.

Mr. Johnson stated that they had gathered "an extensive juvenile history" on the Petitioner, including school records, mental evaluations, and an I.Q. test. These records were compiled before Mr. Johnson was appointed and included the Petitioner's juvenile records as well as the records of the entire family. Mr. Johnson recalled both an adult I.Q. score and a juvenile I.Q. score. He related that the juvenile evaluation of the Petitioner indicated an I.Q. of 63 and a non-verbal I.Q. of 64.

Mr. Johnson stated that he did do mitigation work on the present case, explaining that both he and Ms. Odell did most of the work themselves. A psychological evaluation by Wade Smith on February 27, 1991, indicated a standard test score of 64. Mr. Johnson stated that this score indicated that the Petitioner was in the mild mental retardation range of functioning. He stated, however, that the Visual-Motor Gestalt Test did not reveal any significant organic brain syndrome and that the personality assessment did not reveal significant psychopathology. Mr. Johnson stated that the Petitioner functioned in the lower range of low average intelligence. Mr. Johnson conceded that the Petitioner's I.Q. scores raised a red flag for him. He explained, however, that the Petitioner "was not mentally retarded. He did not fit the definition." Mr. Johnson was under the false impression that the I.Q. needed to be 60 for a legal finding of mental retardation. When presented with the fact that the I.Q. need only be 70, Mr. Johnson stated that his opinion would change. He added that there was another I.Q. score of 82. Mr. Johnson stated that the Petitioner "was not retarded as far as I was concerned." Notwithstanding the concerns regarding the Petitioner's I.Q., Mr. Johnson stated that no further evaluations were ordered. He qualified this by stating that Ms. Odell had the Petitioner evaluated prior to his appointment. Mr. Johnson added that the Petitioner was literate and knew what he was doing.

Mr. Johnson stated that he was aware of a theory of diminished capacity. He stated that the Petitioner's mental state would play a role in the Petitioner's case. He conceded that several low I.Q. scores prior to the age of eighteen would be mitigation in a capital case. He also stated that, although the Petitioner's "version of what actually transpired actually flip flopped more times . . . ," he consistently maintained that he did not intend to kill the victim.

Mr. Johnson stated that Ms. Odell was in charge of the case. Mr. Johnson and Ms. Odell went to talk to the witnesses, but he could not recall the names of the persons they talked to or the number of people they interviewed. Mr. Johnson stated that they did not hire a person to assist in mitigation. He stated that they talked with family members to develop mitigation themes. They had the Petitioner's juvenile records and school records. They knew that the Petitioner's stepfather was a drug dealer, and he recalled that one uncle was in a wheelchair as the result of a shooting from a robbery. Mr. Johnson stated that the Petitioner's grandmother was the primary support person in the family. Mr. Johnson could not recall anything significant regarding the Petitioner's life nor could he recall whether the Petitioner had any children. He did recall that the Petitioner had a "terrible, horrendous, juvenile court – juvenile history." He recalled seventeen or eighteen contacts in juvenile court.

Mr. Johnson did not recall that the Petitioner had lived in LeMoyne Gardens. He did state that a person's environment was a factor to consider in mitigation in a capital case. He agreed that, in a capital case, counsel should try to present to the jury every possible variable that might assist the defense. Mr. Johnson vaguely recalled that the Petitioner had previously been shot in the leg. He did not recall that the Petitioner had been pistol whipped as a juvenile.

Regarding his relationship with the Petitioner, Mr. Johnson explained that their relationship was "kind of on and off on occasion." He stated that sometimes the Petitioner would talk to him and other times he would not; sometimes the Petitioner would become very angry. Mr. Johnson recalled at least six or seven occasions when he met with the Petitioner, in addition to telephone calls between them. Mr. Johnson estimated that each meeting with the Petitioner lasted thirty to forty-five minutes.

Mr. Johnson recalled that, at the beginning, he discussed the case with the Petitioner. The Petitioner told him that the shooting arose from an altercation about a girl, a love triangle. Later, the Petitioner stated that he did not intend to kill the victim. Mr. Johnson recalled "[f]rom the outset, once [the Petitioner] realized that the story or the version about the girlfriend wasn't going to fly and it had no validity to it[,]" they addressed the issue of whether or not the Petitioner intended to kill the victim. The Petitioner was steadfast in his position that he did not intend to kill the victim.

Mr. Johnson handled the suppression hearing and recalled preparing the Petitioner to testify at the hearing. Mr. Johnson did not recall that no questions were asked regarding opinions about the death penalty during voir dire. He could not provide an answer as to why such questions were not asked nor could he provide an answer as to why no challenges were made to the constitutionality of the death penalty on direct appeal. Mr. Johnson could not provide an answer as to why no challenge was made to the denial of the motion to suppress on appeal.

Mr. Johnson agreed that the testimony of the medical examiner was important in this case. He acknowledged that the medical examiner's testimony was the main evidence regarding the heinous, atrocious, and cruel aggravator. The main issue was how long the victim was conscious. The testimony at trial indicated that the victim could have survived two to fifteen minutes. The

medical examiner further indicated that the victim was conscious for only about four to five minutes. Regarding the time frame of the victim's death, Mr. Johnson stated:

> . . . we knew that the guy had lived for some period of time after he was shot. . . . This is where the individual was shot several times under the truck. . . . He was laying there – he was dying for some period of time. It wasn't where he was just shot and died instantly. There was nothing like that at all.

Multiple witnesses stated that the victim was moaning for fifteen to twenty minutes.

Mr. Johnson stated that the Petitioner did not testify at the guilt phase; however, he did testify at the sentencing phase. Mr. Johnson stated that he did not think that they had records of the Petitioner's stepfather, Mitchell Boyd, Sr. Regarding the Petitioner's performance at school, Mr. Johnson stated that he recalled that the Petitioner was a "lower average achiever." He also recalled reviewing the Petitioner's hospital records from Methodist Hospital. However, he could not actually recall that the Petitioner had previously been shot. Mr. Johnson stated that, in his opinion, the fact that the Petitioner had previously been shot in the leg was not an important factor in mitigation.

Mr. Johnson recalled the events of the crime:

> When they came into the apartment complex, they were getting ready to rob them then. They went up and visited the girls. When they came back down, that's when the robbery ensued. [The Petitioner] took part in the robbery. He stood there. When the other guy drove up, Ontrain Sanders drove up. Ontrain walked up to see what was happening. [The Petitioner] shot at him and hit him and chased him. And I remember the two hundred and seventy-three yards . . . it was ninety yards. Almost the length of a football field that [the Petitioner] chased this man around through the apartment complex, down through it, went under – the man under the truck. [The Petitioner] gets down on his hands and knees and shoots under the truck and shoots the guy. He comes back around from the apartment complex, covers the same ninety yards, goes back up where the robbery is still taking place, where one guy is still there. This guy gets up to run, and [the Petitioner] shoots him twice. And then he goes home and goes to sleep with his girlfriend. I remember. Since I read the opinion. We had a lot to deal with as far as the premeditation and the deliberation was concerned. Because of the long period of time that the incident took place.

Mr. Johnson stated that Ms. Odell talked with Teresa Wiggs. He stated that there was no reason to call her as a witness at trial. He recalled that the Petitioner told them that after the murder, he went home and went to bed.

Mr. Johnson stated that, at the suppression hearing, the defense team raised the issue that one of the police officers promised the Petitioner that the charge was going to be voluntary manslaughter. Mr. Johnson recalled telling the Petitioner that it made no difference where the victim was shot; the

Petitioner maintained that it was only voluntary manslaughter because he shot him below the waist. Mr. Johnson stated that the Petitioner's reliance upon the officer's information that shooting below the waist was only voluntary manslaughter was the basis of the Petitioner's confession and, subsequently, the motion to suppress.

Mr. Johnson stated that he did not specifically recall the testimony of Terrance Poland. He did recall the Petitioner stating that the victim went back toward his vehicle, but he never made it and ran past his car. There was information that Poland was just as culpable as the Petitioner. Mr. Johnson stated that the Petitioner was not present during the robbery; rather, he was chasing Ontrain Sanders around the back of the apartment complex. He stated that both the Petitioner and "Little Darryl" chased Sanders and that "[t]he other guys were still trying to get the guy out of the car to rob him." Mr. Johnson recalled that:

> When [the Petitioner] and the other guy came back from around the apartment complex, . . . one of the guys had an automatic . . . he had emptied his automatic, the slide was struck back, he came back – they came back and reloaded. And when he came back and reloaded, that's when they were standing there watching them still trying to drag the one guy out of the car. They get him out of the car, take the guy's jacket off. The guy gets up and tries to run, and [the Petitioner] shoots the guy twice. Shoots him once in each leg. So, no. He was not present. I mean the robbery was still going on while he was chasing Ontrain Sanders back of the apartment complex.

Mr. Johnson stated that, although the Petitioner may have been inside when the robbery started, the Petitioner came out and took part in the robbery. He admitted that it would have made a difference if the Petitioner had appeared at the scene at the same time as the man in the Cadillac. Mr. Johnson stated that, at the time Ontrain Sanders arrived, the robbery had already taken place. Mr. Johnson stated that it was shown that, if the Petitioner arrived at the scene at the same time as Ontrain Sanders, it would have shown that the Petitioner was not involved in the robbery.

Mr. Johnson affirmed that the Petitioner did not receive any proceeds from the robbery, but he stated that the Petitioner "participated in the robbery of the guy out of the car, the gray car, when he shot the guy in furtherance of the robbery." Mr. Johnson stated that the defense team "gave him the best we could do based upon what we had. . . . [The Petitioner] shot the man, Ontrain Sanders, for no reason. Period." Mr. Johnson added:

> [The Petitioner] told me that there was an altercation about a girlfriend. That's how he had – had the altercation with the two guys in the car about a girl. That was his version about what actually transpired. No. [The Petitioner] was not truthful in the beginning. He's not truthful now. And he probably won't be truthful twenty years from now, if in fact this case is still going on that long.

Mr. Johnson stated that no witnesses testified for the Petitioner at the guilt phase. However, the Petitioner testified at the penalty phase. Mr. Johnson recalled that there was a forty- or fifty-year

offer on the table from the State and that the defense team "negotiated really hard." He testified that they informed the Petitioner's grandmother of the offer, and she was to discuss the offer with the Petitioner. The Petitioner rejected the offer. Mr. Johnson stated that "it wasn't really as much [the Petitioner] rejecting it as it was his uncle rejecting it." He could not recall an offer of life plus thirty years. He did recall a three-way conversation with the Petitioner and the Petitioner's uncle after the sentence of death was imposed. The Petitioner's uncle asked if the Petitioner could now accept the fifty-year offer, and Mr. Johnson told him it was to late to accept the offer.

Mr. Johnson stated that Teresa Wiggs' account of the Petitioner's behavior on the night of the murder, that is, the fact that he was "extremely upset and was crying," would have been important to show his remorse. He stated that this was not what actually transpired. Mr. Johnson testified that the Petitioner said he went to Teresa Wiggs' apartment and slept. Mr. Johnson acknowledged that the fact that the Petitioner became a father prior to his trial would have been important.

Mr. Johnson summarized the defense in the Petitioner's case as essentially no defense. He acknowledged that the opening statement of Ms. Odell did not set forth any theory of defense or the fact that the Petitioner did not intend to kill anybody. He stated that not mentioning any facts in opening statement was a tactical decision. He explained that "if the facts are against you, you try not to argue facts before the jury or tell the jury what you are going to do, if you can't prove them." Mr. Johnson explained that the Petitioner never denied shooting the victim; rather, he stated that he only intended to shoot him in the legs. In other words, the Petitioner felt that because he shot the victim below the waist, the victim was not supposed to die. Mr. Johnson stated that the Petitioner intended to shoot the victim and that the victim's death was a natural consequence of being shot.

Mr. Johnson recalled that Carlos Sanders testified at the Petitioner's trial. Carlos Sanders testified that his father took his gun away. Mr. Johnson could not recall why they decided not to cross-examine Carlos Sanders. He stated that he did not know why Carlos Sanders was not charged as an accomplice. Mr. Johnson recalled that, although there was not a lot of information regarding intoxication, they had knowledge that the men at the Sanders' apartment had been drinking whiskey and beer. He stated that no witness testified regarding the Petitioner's level of intoxication. He averred that there was no indication that anybody was "intoxicated, inebriated, drunk, talking out of their heads, stumbling, falling, nothing to that effect was ever brought out." Mr. Johnson stated that the defense team did not ask questions regarding levels of intoxication because there was no information that anybody was drinking or that anybody was drunk. In fact, Mr. Johnson testified that "[t]here was nothing in the record that even indicated that [the Petitioner] had anything to drink at all."

Regarding the penalty phase, the defense team introduced the Petitioner's family history. Mr. Johnson recalled that the Petitioner's mother testified. He stated that there was some concern over the Petitioner's mental condition. However, because the Petitioner had a I.Q. of 60 on one test and an I.Q. of 85 on another, he was unsure as to whether the Petitioner actually had a mental impairment. He explained that the Petitioner was able to converse, the Petitioner was articulate, and

the Petitioner understood what was going on. Based on these factors, the defense team relied upon the higher I.Q. score. Mr. Johnson conceded that the Petitioner had two I.Q. scores as a juvenile, one at 60 and one at 64. This information was not presented to the jury. When confronted with information that the Petitioner's tested I.Q. of 82 was also indicative of low functioning, Mr. Johnson stated that he was unaware that this was not extremely below average. He conceded that it was a factor to consider in explaining the Petitioner's statement that he did not intend to kill the victim. Later, Mr. Johnson conceded that the I.Q. of 82 was the Petitioner's verbal I.Q. score from a test when he was seventeen years old.

Mr. Johnson stated that "[t]he sentencing phase kind of went awry." He explained that the Petitioner "interjected into the record things that should have not been there." Mr. Johnson testified that they did prepare the Petitioner to testify. Specifically, he stated that they had "prepped him long enough . . . for him to understand that he was not to be mentioning any drugs or anything." Mr. Johnson stated that the only time that drugs were mentioned was during the Petitioner's testimony when he stated that "he was just out there selling drugs." Mr. Johnson stated that he was not aware that "all the male figures [in the Petitioner's life] on a daily basis sold drugs." He was aware that the Petitioner's stepfather and uncle sold drugs. Mr. Johnson agreed that these factors could be considered as mitigation evidence, but he did not agree that this information explained the Petitioner's own involvement in selling illegal drugs.

Mr. Johnson explained mitigation proof as "an excuse for why I did what I did." He continued:

> These are things that happened in my life that caused me to do what I did. So if you look at this, I grew up in a home without a father. . . . My grandmother raised me. I didn't have shoes on my feet. . . . I . . . couldn't read as well as I could. Therefore, I can go out, I can commit murder, therefore, you should excuse me for killing . . . because I didn't have the same advantages everybody else had. These are factors that go into the reason why I did what I did. So that's on base level . . . is what mitigation is all about.

Mr. Johnson could not explain why they did not offer information regarding the Petitioner's mental status at the penalty phase. He stated that, even considering the Petitioner's low I.Q., the Petitioner "was not mentally incompetent . . . he was not retarded . . . [h]e was just a little slow." Mr. Johnson could not explain why more information regarding the Petitioner's life was not introduced as mitigation proof, including information that the family had to move from Germantown into low income housing, the fact that all the male figures in the Petitioner's life sold drugs, the fact that the Petitioner started carrying a weapon when he was seventeen, the fact that the Petitioner had a son, and the fact that the Petitioner had been pistol whipped and shot in the leg. Mr. Johnson testified that he spoke with the Petitioner's Uncle Travis. He did not recall speaking with Larry Bland or Sandra Bland. He also did not recall speaking with Kevin Smith, Dorothy Smith, Irish Rutherford, Karen Jackson, Tamara Jackson, or Perinta Bland. Similarly, Mr. Johnson could not recall speaking with Toni Bland, Jessie Mooney, or Kevin Williams. He stated that they interviewed the Petitioner's

mother and grandmother. Mr. Johnson agreed that, during the penalty phase, the State focused on the Petitioner's lack of remorse.

Mr. Johnson confirmed that the jury found the presence of the heinous, atrocious, or cruel aggravating circumstance. When presented with the verdict form, he stated that the verdict listed two aggravators: (1) cruel and (2) torture. He agreed that the wording on the verdict form was unclear. Mr. Johnson explained that he did not see the verdict form, and this fact precluded an objection thereto.

Mr. Johnson did not request an institutional history or jail record of the Petitioner while he was incarcerated pretrial. He was aware that the Petitioner did not get into any trouble. He was uncertain as to the mitigation value of this type of evidence. Mr. Johnson did not recall raising any objection to the victim impact evidence. He recalled that the victim impact testimony offered "didn't go above and beyond."

Mr. Johnson testified that the defense team raised some objections regarding the jury instructions, but he could not recall the specific objections. He agreed that, on direct appeal, this court determined that any error in the jury instructions was harmless. Mr. Johnson stated that he could not recall the reason for not challenging the Petitioner's non-capital convictions on direct appeal. He explained that they "focused in on what we thought we could win with." He agreed that they did not raise any of the constitutional challenges against the death penalty on appeal. He also conceded that the defense team did not challenge the jury instructions on appeal. Mr. Johnson stated that they were of the opinion that they would be successful in their challenge to the sufficiency of the evidence issue on appeal. He explained that, in his opinion, the State did not prove its case. The sufficiency of the evidence was also the main argument before the Tennessee Supreme Court.

Patricia Odell testified that she represented the Petitioner. Specifically, she stated that she was appointed to represent the Petitioner in June 1993. In 1993, approximately half of Ms. Odell's practice was criminal law. She admitted that, at the time of her appointment, she had not tried a homicide case alone. She stated that her formal training in criminal work was limited to "law school and attending various continuing legal education seminars and working with Chancellor Peete. . . ." Ms. Odell admitted that, regarding death penalty work, she had no other training other than "law school . . . and working with Chancellor Peete and that was very limited on death penalty cases." Ms. Odell stated that she "did ask the [trial court] to appoint a more experienced attorney." This led to the appointment of William Johnson. Ms. Odell stated that, after Mr. Johnson's appointment, he did the majority of the trial work. She explained that Mr. Johnson was the person with the experience. She further explained that no one was ever named lead counsel.

Between the time of her appointment and Mr. Johnson's appointment in October, Ms. Odell did not have the Petitioner evaluated by a psychologist and did not obtain the services of an expert. Ms. Odell did not subpoena any records on the Petitioner. She said that she seemed to recall that the Petitioner's juvenile records were obtained as part of discovery received from the State. Ms. Odell recalled that, even after Mr. Johnson was appointed, neither of them had the Petitioner evaluated by

a psychologist nor did they have an independent expert review the Petitioner's juvenile court "psyche records." Ms. Odell stated that she and Mr. Johnson conducted the investigation themselves. They never hired a mitigation specialist. She stated that Mr. Johnson developed the mitigation proof.

Regarding the Petitioner's I.Q., Ms Odell recalled that a 1988 psychological report reflected that the Petitioner had a verbal I.Q. of 63 and a non-verbal I.Q. of 64. She explained that these scores did not cause much concern because she discussed the report with the Petitioner. Another psychological report dated February 1991, produced a standard score of 64. Ms. Odell could not recall this document. She recalled discussing the Petitioner's I.Q. but could not recall any specifics or the outcome of the discussion. She could not recall what other factors they were considering at the time. Neither could Ms. Odell recall what was discussed as being important for mitigation.

Ms. Odell testified that the Petitioner said that he did not intend to kill the victim. In preparing for trial, Mr. Johnson and Ms. Odell worked together, visited the Petitioner together, went through witness testimony together, and visited the crime scene together. However, Ms. Odell stated that Mr. Johnson actually handled the trial. Ms. Odell stated that the Petitioner did not give them the names of any witness. However, they spoke with the Petitioner's family members, including his mother, his grandmother, and his Uncle Travis.

Ms. Odell testified that the plea offer was communicated to the Petitioner, but his uncle advised him not to accept it. She stated that the offer was for forty years. Ms. Odell recalled that, after the death penalty was imposed, the Petitioner's uncle wanted to accept the offer. She stated that every conversation with the Petitioner was in preparation for the trial. Ms. Odell stated that the Petitioner had admitted on more than one occasion that he had committed the crime. She stated that he would not give them names of any witnesses to assist in his defense, not even in the mitigation stage, other than his family members. She conceded that they really did not have a defense. She stated that they argued that the Petitioner did not intend to kill the victim. Ms. Odell recalled receiving information regarding the Petitioner's neighborhood. She could not remember anything about the Petitioner's stepfather. She could not remember any incident in which the Petitioner was hit in the head with a gun. She could not recall that the Petitioner had previously been shot in the leg. She could not recall investigating the Petitioner's behavior during his incarceration prior to trial. She could not recall the Petitioner's girlfriend nor did she recall whether the Petitioner had any children. Ms. Odell could not recall speaking with the following persons: Sandra Bland, Kevin Smith, Dorothy Smith, Irish Rutherford, Carolyn Jackson, Tamara Jackson, Rose Tatum, Teresa Wiggs, or Perinta Bland. Ms. Odell did not meet with the coroner prior to trial; however, she did review the autopsy report.

Regarding the Petitioner's appeal, Ms. Odell conceded that the defense team had omitted an issue regarding an erroneous jury instruction. She could not recall why they elected not to include the issue on appeal. Ms. Odell could not recall why the defense team opted not to challenge the Petitioner's non-capital offenses.

On cross-examination, Ms. Odell stated that she had received an offer from the State before

Mr. Johnson was appointed. Based upon the advice of his uncle, the Petitioner rejected the offer. She stated that the Petitioner did not want to testify during the guilt phase of the trial. She also stated that, while she was aware that the Petitioner was involved in the sale of illegal drugs, she was uncertain as to the businesses of the Petitioner's family members. Ms. Odell stated that they attempted to keep knowledge of the Petitioner's drug-dealing from the jury. However, when he testified at the penalty phase, the Petitioner's involvement was revealed. In fact, the Petitioner stated that he was armed because he was dealing drugs. Ms. Odell recalled that when the prosecutor asked the Petitioner why he shot the victim so many times, the Petitioner responded that he was mad. The Petitioner added that "[h]e was out there selling dope and this person came up and so he said he was mad [was] the reason he shot him."

Ms. Odell acknowledged that the Petitioner shot the victim more than one time. She recalled that testimony indicated that the victim's leg "looked like ground hamburger meat." She stated that a report by Dr. Parr indicated that the Petitioner had a verbal I.Q. of 82. Moreover, the report indicated "a very strong antisocial orientation." It further reflected that the Petitioner was "very narcissistic in orientation and typically utilitarian and manipulative in his relationships with other people." The report additionally indicated:

> [H]is social skills are seriously impaired, and his relationships with others tend to be highly conflicted and generally very short lived. There is also evidence of considerable anger, and overt expressions of hostility are probably not unusual. Further, his impulse control is seriously impaired and shows a very high potential for acting out and using poor judgment.

Although she did review the autopsy report, Ms. Odell did not meet with the coroner prior to trial.

Ms. Odell stated that they talked with two witnesses, a man who lived on the second floor of the apartments and came out to observe the incident and another man who owned the truck. The man who owned the truck told them "how the person was laying under the truck . . . [the victim] ran under the truck and [the Petitioner] got down on his - - he kneeled down and shot under the truck." The Petitioner told Ms. Odell that "[h]e was out there selling his drugs and this person came up and got in his way." She could not recall any theory about a robbery taking place. Ms. Odell stated that the Petitioner did not give them the names of any witnesses. She explained that they only learned about the Petitioner's uncle because he came to court one day. She testified that they told the Petitioner's family members to come to court and to bring other family members with them.

Regarding information that the Petitioner had lived in a house in Germantown paid for by his stepfather's drug dealing, Ms. Odell stated that she would have wanted to evaluate this information more carefully. She explained that she would not want to have appeared to have been glorifying the drug life.

Dr. Angelillo first met the Petitioner in June 2003, for the purpose of performing a psychological evaluation as to the Petitioner's mental status and intellectual functioning. Dr.

Angelillo reviewed psychological evaluations of the Petitioner conducted in 1988 and 1991. He stated that he also reviewed the Petitioner's juvenile court records.

Dr. Angelillo stated that the evaluation by Dr. Allen Battle indicated that the Petitioner had a verbal I.Q. of 63 and a nonverbal I.Q. of 64. An evaluation of the Petitioner by Dr. Parr in July 1991, indicated a verbal I.Q. of 82. Dr. Parr also administered the Rorschach test and the Bender test. However, Dr. Parr's testing, which indicated an I.Q. of 82, was not a full-scale I.Q. Dr. Angelillo surmised from review of these prior tests that "two thirds of these scores show a severe impairment cognitively at that time." Dr. Angelillo stated that Dr. Parr's report noted that neither the Petitioner's insight nor judgment appeared to be lacking. However, Dr. Battle's report indicated signs of stress, so there were differing findings.

Dr. Angelillo evaluated the Petitioner and determined that the Petitioner's I.Q. was 85. He stated that this score was "well below average." Dr. Angelillo determined that the Petitioner's verbal I.Q. was 89. Dr. Parr scored the Petitioner's verbal I.Q. at 82. Dr. Angelillo stated that an I.Q. score can be improved "in an intellectually enriched environment" by extensive reading and acquiring new information. Dr. Angelillo noted that the Petitioner had been reading "a great deal." He added that there was no way to determine at the present what the Petitioner's I.Q. was ten years ago. Dr. Angelillo stated that parts of Dr. Parr's report were somewhat ambiguous.

Dr. Angelillo also performed two objective psychological tests, the Minnesota Multi-Phasic Personality Inventory and the Millon Clinical Multiaxial Inventory. These tests indicated that the Petitioner was experiencing difficulties with memory, concentration, and thinking. Individuals with elevations, such as the Petitioner, are extremely vulnerable and apt to panic when they feel such vulnerability arising. Dr. Angelillo also determined that the Petitioner would perform bizarre acts, sometimes as acts of self-protection and other times in retaliation for what he perceived as threats to his safety. Dr. Angelillo's testing also revealed the Petitioner as a person in an elevated range of being driven by strong ambitions and a need to prove himself and moving into action when threatened. Another elevated area in the Petitioner's test is called psychasthenia, which is a reflection of anxiety. In summary, Dr. Angelillo's evaluation of the Petitioner indicated that it could be determined that the Petitioner was sociopathic or somebody who would take advantage of other people to achieve his own ends.

Dr. Angelillo interviewed the Petitioner at Riverbend and at the Shelby County Jail. He described the interview at the jail. He observed that the Petitioner appeared stressed. The Petitioner told him that he was exhausted. Dr. Angelillo observed that the Petitioner's ability to think and plan was significantly impaired. He stated that the Petitioner was not psychotic. The Petitioner, however, had difficulty in perceiving threats from the environment. Dr. Angelillo stated that, in his opinion, the Petitioner should have been re-evaluated. When questioned as to the Petitioner's psychological functioning, Dr. Angelillo responded:

> These tests pick up two different things. They pick up long-term kind of traits and they also pick up his current functioning. Some of these things were quite similar to

what was written about many years ago. I might think for most people those are traits, those are things about our personality that may not change. . . . I believe that [the Petitioner's] tendency may be to perceive threat where other people might not would also think wouldn't have a whole lot of chance to change seeing as how where he is a resident at this time.

He added that the Petitioner's psychological impairments would have impacted the Petitioner's ability to maturely contemplate what he was doing, the gravity of what he was doing because of the perception of a threat.

On cross-examination, Dr. Angelillo acknowledged that psychological testing could not go back in time. In other words, the testing of the Petitioner established his condition at the time of the testing. At the time of his testing, the Petitioner had been on death row at Riverbend for ten years.

Gerald Skahan, an attorney in private practice in Shelby County, testified that his main area of practice was criminal defense work. Specifically, Mr. Skahan testified that he was involved in more first degree murder trials than any other type of criminal defense work. In reviewing the Petitioner's case, Mr. Skahan stated that the failure of the defense team to hire a mitigation specialist fell below the minimal standards for competent counsel in a capital case. Mr. Skahan further stated that, in every capital case, it was important to ask questions about the death penalty during voir dire. He also stated that, under the facts of the present case, an attorney could make a rational argument that, because the Petitioner had previously been shot in the leg and survived, the Petitioner's intent was to incapacitate the victim rather than kill him. Mr. Skahan added that sometimes the fact that a capital defendant has a child is the greatest mitigator of all. In reviewing the transcript of the trial, Mr. Skahan concluded that defense counsel put forth no defense at all. Mr. Skahan further criticized the verdict form as there was no statutory aggravating circumstance found by the jury.

**Findings of Post-Conviction Court**

On November 28, 2006, the post-conviction court entered an order denying the Petitioner relief. The post-conviction court's findings of fact and conclusions of law are summarized as follows:

The [P]etitioner contends trial counsel's representation was ineffective. [The] Petitioner lists seventy-six specific allegations of error. . . .

. . . .

I. Counsel's Working Relationship with [the] Petitioner

[The] Petitioner contends counsel failed to establish a proper working relationship with him. . . . Post-conviction counsel argues that had counsel developed a better relationship with [the P]etitioner, then [the P]etitioner would have

-27-

been able to provide trial counsel with valuable investigative assistance, including the names of witnesses whose testimony would support defense theories and serve as proof as mitigation. Post-conviction counsel further argues that had such a relationship been established [the P]etitioner could have provided counsel with valuable information regarding his medical background, including mental health, as well as family and juvenile records.

This court finds this argument to be without merit. There is nothing in the record either at trial or on post-conviction to indicate that the [P]etitioner did not have a good working relationship with counsel. Ms. Odell described her relationship with [the P]etitioner as good and indicated she spent a considerable amount of time with [the P]etitioner explaining the charges against him; preparing him to testify and discussing his case. While Mr. Johnson admitted that his relationship with [the P]etitioner was "on and off," he also indicated this was due to [the P]etitioner's behavior. . . . Both counsel testified that [the P]etitioner could be difficult and refused to provide them with the names of witnesses, including family members, who might assist him in his defense or testify at mitigation. . . . [B]oth testified that they spent a considerable amount of time preparing [the P]etitioner to testify only to have [the P]etitioner proceed on a tangent during his sentencing phase testimony resulting in the admission of evidence they had worked diligently to exclude during the guilt phase of trial. . . . [A]ny lack of communication or break down in the relationship between counsel and [the P]etitioner was the result of [the P]etitioner's behavior not that of counsel. Therefore, this court finds counsel's performance was not deficient in this regard.

II. Identifying, Locating and Interviewing Witnesses

[The] Petitioner contends counsel failed to adequately prepare for [the P]etitioner's representation by failing to properly investigate, identify and prepare all relevant witnesses, including but not limited to: persons who were in contact with the [the P]etitioner around the time of the crime; persons who were in contact with key State's witnesses at or near the time of the crime, the [S]tate's witnesses against the [P]etitioner; law enforcement officers involved in every stage of the investigation of this offense; witnesses familiar with aspects of the [P]etitioner's life history and members of the victim's family. [The] Petitioner contends that had counsel adequately prepared for this case, then they would have discovered legitimate theories of defense; evidence tending to impeach the testimony and credibility of the [S]tate's witnesses; and comprehensive and compelling mitigation evidence. . . .

. . . .

Although [the P]etitioner introduced testimony from two of the participants in the robbery, neither of these witnesses testified that the [P]etitioner did not shoot

the victim. In fact, each indicated that they saw the [P]etitioner shoot the victim. . . . Darryl Bailey testified that he would not have spoken with [the P]etitioner's counsel even if he'd been approached by them. . . . Robert Davenport . . . although he now claims he would have spoken with . . . trial counsel, this court does not find his assertion credible. . . . [H]e likely would not have been willing to testify on [the P]etitioner's behalf. Thus, this court finds [the P]etitioner's assertion that counsel was somehow remiss in failing to identify these two men as potential witnesses to be without merit.

This court also finds that [the P]etitioner has failed to demonstrate that counsel was deficient in failing to interview and investigate the [S]tate's witnesses and all law enforcement involved in the investigation of the murder. [The] Petitioner has failed to establish that counsel did not perform such an investigation and has failed to present testimony from any of those witnesses which would demonstrate that the alleged failure of counsel to investigate such witnesses caused him prejudice.

Finally, this court finds counsel did in fact interview certain of [the P]etitioner's family members in an effort to develop a more complete history of [the P]etitioner's life and background. . . . [I]t does appear both [the P]etitioner's mother and grandmother testified at sentencing portion of [the P]etitioner's trial. [The] Petitioner's mother testified regarding [the P]etitioner's dropping out of school and juvenile arrests. She also testified regarding [the P]etitioner's decision to turn himself into police. . . . [T]his court is not convinced that counsel was deficient in failing to present each and every witness at trial. Counsel presented testimony from those persons who either helped raise the [P]etitioner or had a significant impact on his life. While other witnesses may have been available to trial counsel, this court does not find their decision not [to] call additional family members to fall below the reasonable standard of representation required. . . .

III. Developing and Preparing Mitigation

[The] Petitioner contends counsel failed to adequately develop and prepare mitigation evidence. . . . He contends that, had counsel spoken with these witnesses, they would have developed additional information for mitigation, would have gained information that would support [the Petitioner's] claim of diminished mental abilities and negated intent; and would have been able to present valuable testimony that would have corroborated [the P]etitioner's testimony regarding his remorse. . . .

. . . [P]etitioner contends counsel was deficient in failing to request and review [the P]etitioner's juvenile, school and jail records of [the P]etitioner. Post-conviction counsel contends that, if trial counsel had obtained these records, then they would have known they should have had [the P]etitioner evaluated prior to trial and could have presented expert testimony that would have been valuable to mitigation. . . .

-29-

This court finds [the P]etitioner's contention that counsel was deficient in failing to interview additional members of [the P]etitioner's family to be without merit. . . . [I]t appears to this court that the remainder of the witnesses would have provided similar information. This court does not find counsel was deficient for failing to present this redundant proof. Moreover, this court finds [the P]etitioner bears some responsibility in calling potential witnesses to the attention of counsel. He was in the best position to let counsel know that certain family members might be available to testify. Both trial counsel testified that they repeatedly asked [the P]etitioner for this information and [the P]etitioner failed to provide it. . . .

Next, this court finds that, despite [the P]etitioner's contentions, it appears counsel did have at least a portion of [the P]etitioner's juvenile and school records. Moreover, this court finds that given the fact that [the P]etitioner does . . . [have] an I.Q. well above the mentally retarded range and nothing in the records indicated that [the P]etitioner suffered from a mental disorder or defect, counsel was not deficient in failing to obtain a mental health expert to assist them during the trial and was not deficient in failing to present evidence of low intellectual functioning to the jury during mitigation. Finally, this court finds counsel was not deficient in failing to hire a mitigation specialist. . . .

IV. Motions Practice

[The] Petitioner contends trial counsel failed to engage in the motions practice necessary to protect his constitutional rights. . . .

[The] Petitioner's contentions are without merit. [Several] of the . . . assertions . . . have previously been determined to be without merit by numerous appellate decisions. Although [the P]etitioner lists over twenty specific allegations, which he claims renders Tennessee's statutory scheme unconstitutional, the Tennessee appellate courts have continuously addressed these claims and have found each to be without merit. . . . Moreover, it appears to this court upon review of the trial transcript that counsel did in fact raise this issue pre-trial.

Likewise, with regard to [the P]etitioner's argument that the death penalty violates international law, this court . . . finds that this identical argument has . . . been rejected by the Tennessee appellate courts. . . . Additionally, the Tennessee Appellate Courts have also addressed allegations that the heinous, atrocious and cruel aggravating circumstance is facially unconstitutional and found such arguments to be without merit. . . .

With regard to [the P]etitioner's contention that trial counsel was deficient in failing to file a motion for bill of particulars . . . this court finds . . . contentions are without merit. [The] Petitioner is not entitled to general discovery via a motion for

bill of particulars. . . . Nevertheless, after reviewing the trial transcripts and technical record, it does appear that trial counsel filed a motion for bill of particulars. . . .

Thus, the only remaining issue is whether trial counsel[ ] was deficient in filing a motion to suppress [the P]etitioner's statement and whether the suppression motion was heard in a timely fashion. It appears from the trial record that the suppression motion was sufficiently submitted and argued by counsel. While, this court does find counsel remiss in failing to have the motion heard until the day of trial, this court does not find counsel's actions prejudiced the [P]etitioner. [The] Petitioner was given a fair[ ] and full hearing . . . and even took the stand to testify. . . . [T]his court finds that even if counsel were deficient in bringing the motion in a timely manner, [the P]etitioner was not prejudiced by the delay in any way. . . .

V. Inspection and Testing of Physical Evidence

[The] Petitioner contends trial counsel was deficient in failing to inspect, analyze and test the physical evidence available through discovery in this matter. . . . [The] Petitioner does not point to any specific document or object which he claims counsel should have reviewed. . . . [I]t appears to this court that counsel did make a proper discovery request . . . and such request was granted. . . . [T]his allegation is without merit.

VI. Cross-examination of State's Witnesses and Challenging State's Proof

[The] Petitioner contends that after receiving autopsy reports indicating that the [P]etitioner's shots to the victim's legs caused the victim's death, counsel should have met with the medical examiner to discuss his potential testimony. [The] Petitioner also argues that counsel should have obtained a medical expert to confront and rebut the medical examiner's testimony at trial.

Both trial counsel testified that they had the reports prepared by the medical examiner upon which his testimony was based. . . . [T]his court does not find that their failure to perform such an interview results in [d]efective representation. The medical examiner basically testified that the gun shot wounds to the victim's legs severed his femoral artery and caused the victim to bleed to death. . . . [T]his court finds counsel did not render ineffective representation by failing to interview the medical examiner prior to trial and even if they did, [the P]etitioner has failed to demonstrate prejudice.

. . . [P]etitioner contends counsel's performance was deficient in that they failed to demand or receive the [S]tate's witness list prior. . . . [A] review of the trial record indicates trial counsel did in fact request a list of the [S]tate's witnesses and testimony presented by trial counsel at the hearing on this matter indicates that trial

counsel did in fact interview certain potential witnesses prior to trial.

. . . [P]etitioner contends that trial counsel was ineffective in failing to cross-examine Carlos Sanders . . . .

At trial, Carlos Sanders gave a brief statement in which he indicated [the P]etitioner was present for some portion of the planning of the robbery. However, he was unable to give any details regarding what was discussed during these conversations and provided no additional testimony other than this bare assertion. . . . [T]his court declines to second guess trial counsel's tactical decision to forego cross-examination of this witness. Since this court finds counsel's decision was based on adequate preparation, this court will not find counsel was ineffective simply because their decision may have hurt [the P]etitioner's case. . . .

VII. Request for Pre-Trial Morgan Hearing

[The] Petitioner contends counsel's performance was deficient for failing to request the trial court conduct a hearing out of the presence of the jury to determine what, if any, of his prior convictions could be used to impeach his testimony at trial. . . . [A]fter looking to the trial record in this matter, it appears trial counsel did in fact file a motion [for] a pre-trial Morgan hearing; however, such motion was withdrawn on the day of trial. While this court will not speculate, it is obvious that at that point counsel may have determined that their client would likely not testify and thus, such a hearing was not necessary. . . . [I]t is not necessary to speculate, because the court finds that the decision to forgo this motion was neither ineffective nor prejudicial. . . .

VIII. Retention of Mental Health Expert

[The] Petitioner contends counsel failed to obtain a mental health expert to evaluate his mental health, intelligence and social background. He claims an expert was needed in order to support an argument for lesser included offenses and diminished capacity at the guilt phase and to bolster mitigation evidence presented at the sentencing phase. He contends had counsel retained such an expert they would have discovered that he [had a] below average mental functioning and an I.Q. that [was] far below the average I.Q. of males his age.

This court finds this allegation is without merit. [The] Petitioner's own expert testified at the hearing . . . that [the P]etitioner has a full scale I.Q. of 85. . . . [T]his level of functioning is well above mental retardation. [The] Petitioner's mother and grandmother testified that the [P]etitioner had trouble in school and eventually dropped out of school. Thus, a portion of this information was placed before the jury during mitigation. . . . [T]his court is not convinced . . . that a defense of diminished

capacity could be sustained. . . . Dr. Angelillo admitted that the symptoms he described could just as likely fit a[ ] sociopath pathology. Such information would just as likely have been damaging to mitigation as helpful. . . . [T]his court does not find [the P]etitioner was prejudiced by their inaction. . . .

## IX. Plea Negotiations

[The] Petitioner contends counsel failed to negotiate with the [S]tate and failed to explain the negotiations process to him until the eve of trial. . . . This allegation has no merit. Both trial counsel testified that the [P]etitioner was offered forty years and both testified that they urged [the P]etitioner to take the offer. . . . [P]etitioner's uncle advised him not to take the offer and [the P]etitioner eventually declined the offer. . . . [T]his court finds counsel negotiated a very favorable deal . . . which [the P]etitioner chose to reject.

## X. Counsel's influence on [the P]etitioner's right to testify and preparation for testimony

[The] Petitioner contends counsel failed to allow him to testify in his defense at the guilt phase of the trial. [The] Petitioner contends counsel continually ignored his client's desire to tell the jury that he did not intend to kill the victim. Additionally, he argues counsel failed to adequately prepare him to testify in the sentencing portion of the trial.

. . . [The Petitioner] was not prejudiced because he was also examined by the court regarding his decision not to testify and clearly indicated that he wished to waive his right.

With regard to his testimony at the sentencing portion of the trial, this court finds trial counsels' testimony persuasive. Both counsel testified that they spent several hours preparing [the P]etitioner to testify and discussed in detail how they did not want [the P]etitioner to discuss his prior criminal activity and drug use. . . . [I]t appears [the P]etitioner ignored their advice to his own detriment. Thus, this court finds these allegations are without merit.

## XI. Jury Questionnaire and Jury Voir Dire

[The] Petitioner contends counsel was ineffective in failing to request a jury questionnaire; failed to properly voir dire jurors regarding the appropriate weighing approach to be used by the jury in evaluating mitigating and aggravating factors; failed to properly voir dire jurors regarding the burden of proof both with regard to guilt and with regard to aggravating and mitigating factors; failed to ask potential jurors about their views regarding the death penalty; failed to inquire as to whether

-33-

juror Rozell Ross had the ability to be fair given that Ross had been the victim of a robbery; failed to question jurors Tucker, Tatum, O'Neal and Rooks; and failed to object to the prosecutions improper argument during voir dire.

These allegations are without merit. Initially, this court notes that juror questionnaires are discretionary and are routinely either denied or modified by trial courts. . . . [T]his court does not find that trial counsel's failure to request a questionnaire, alone, falls so far below the accepted level of representation as to render their representation of [the P]etitioner ineffective. While counsel did not ask specific questions regarding the weighing of aggravating and mitigating factors, both the court and the prosecution extensively reviewed the statute. Thus, any ineffectiveness on the part of trial counsel . . . did not prejudice [the P]etitioner's case. Despite [the P]etitioner's arguments, a review of the trial record indicates counsel did question the jurors about their understanding of the [S]tate's burden of proof and the concept of reasonable doubt. While defense counsel did not question juror Ross about the robbery perpetrated against him, the prosecutor did ask Mr. Ross if there was anything about that incident that would affect his judgment as a juror . . . . Thus, this court finds counsel was not ineffective in failing to question him further. Likewise, this court does not find counsel was ineffective in failing to question jurors Tucker, Tatum, O'Neal and Rooks. The decision whether to voir dire a prospective juror on this issue, or to what degree, is a strategic one. . . . Finally, this court failed to find any misconduct on behalf of the prosecution during the voir dire of potential jurors.

XII. Objection to State's Opening and Closing Statements

[The] Petitioner contends counsel was ineffective for failing to object to the prosecution's improper reference in opening statement to the "American nightmare." This court finds that, although the phrase is inflammatory, it was used only one time during the prosecutor's closing arguments. Thus, this court finds even if counsel was ineffective in failing to raise an objection, the [P]etitioner was not prejudiced by counsel's failure to act.

[The] Petitioner also contends counsel should have objected [to] the prosecution's improper call to the jury, during closing argument of the sentencing phase, to "mete out justice." This court again finds counsel's performance was not deficient for failing to object to the prosecution[']s singular use of the above phrase.

XIII. Opening and Closing Statements

[The] Petitioner contends counsel failed to argue any fact, law, theory or defense during opening and closing arguments of the guilt phase of trial. This court disagrees. Both trial counsel testified at the hearing . . . that they felt [the

P]etitioner's defense was limited. However, both emphasized in opening and closing the presumption of innocence, the [S]tate's burden of proof and reasonable doubt and argued that the [S]tate either would not be able to meet their burden or had failed to meet their burden respectively. This court will not second guess their decisions. . . .

XIV.  Defense and/or Theory of the Case

[The] Petitioner contends counsel failed to form any defense or theory in his case. Specifically, he argues counsel failed to develop proof of diminished capacity; introduce proof of [the P]etitioner's limited intellectual functioning; present an argument for voluntary manslaughter; defend [the P]etitioner under a theory of criminal recklessness; present evidence of [the P]etitioner's own wound to the leg which impacted his state of mind; and failed to present a defense of ignorance or mistake of fact based upon [the P]etitioner's limited intelligence and personal experiences.

. . . [T]his court does not find counsel was ineffective in failing to present proof of mental disease or retardation and was not ineffective in failing to raise a defense of diminished capacity. . . . [T]his court also finds counsel was not ineffective in failing to argue to the jury that the murder was one of voluntary manslaughter or reckless homicide. Likewise, this court can not find that counsel was ineffective in failing to argue ignorance or mistake of fact. Both counsel testified that [the P]etitioner's defense was limited; but, claimed that they attempted to present evidence to the jury that the [P]etitioner did not intend to kill the victim and thus was not guilty of premeditated murder. . . .

XV.  Lesser Included Offense

[The] Petitioner contends counsel was ineffective for failing to demand a jury instruction regarding the lesser included offense of negligent homicide. This court finds that given that other lesser included offenses were charged and the jury found [the P]etitioner guilty of the greater charge, any failure on the part of counsel to request an instruction as to negligent homicide, did not result in prejudice to [the P]etitioner. . . .

XVI.  Burden of Proof

[The] Petitioner contends counsel was ineffective in failing to request a proper jury instruction for the burden of proof in this case; object to the trial court's improper instruction; and in failing to raise this issue in their Motion for New Trial. . . . [T]he jury was instructed that the State bore the burden of proving each element of the offense beyond a reasonable doubt. . . . [T]his court finds counsel's

performance was deficient in this regard. Nevertheless, since the jury essentially received a complete instruction, this court does not find counsel's deficiency prejudiced [the P]etitioner to the point that either a different verdict or punishment would have been accomplished absent counsel's negligence.

XVII. Erroneous Jury Charge

First, [P]etitioner contends counsel was ineffective in failing to object when the trial court failed to properly instruct the jury regarding the appropriate verdict forms for a verdict of death. [The] Petitioner argues that the trial court instruction that was given in the instant case impermissibly instructed the jurors that they must unanimously find mitigation exists in order to consider a mitigation proof and further improperly instructed the jury that they must unanimously reject the death penalty before imposing a lesser punishment. . . . [T]his court finds the trial court gave a proper jury charge. This allegation is without merit.

Second, [the P]etitioner contends counsel was ineffective for failing to request a jury instruction indicating that a deliberate act is one performed with a cool purpose. Again, this court finds the trial court gave a proper instruction and did in fact inform the jury that a deliberate act is one performed with cool purpose. Thus, this allegation is without merit.

Third, [the P]etitioner contends counsel was ineffective for failing to object to the trial court's instruction regarding the definition of a premeditated act. While this court finds the trial court improperly omitted the initial portion of one sentence of the statutory definition; since this court finds the instruction provided still conveys the appropriate law, this court does [not] find trial counsel was ineffective. . . .

Fourth, [the P]etitioner contends counsel should have objected [to] an erroneous jury instruction regarding the proper process the jury should employ when evaluating aggravating and mitigating factors. This court finds the jury charge . . . properly instructed the jury that they were to only consider the aggravating circumstances relied upon by the [S]tate and supported by the proof. . . . [T]his court finds counsel was not ineffective. . . .

Next, the [P]etitioner contends counsel was ineffective for failing to object to the trial court's improper comment regarding mitigation. . . . [The P]etitioner contends counsel should have objected to the court's instructing the jury to consider [the P]etitioner's past criminal conduct. This court does not find [the P]etitioner's interpretation of the instruction given persuasive. . . . The court also properly instructed the jury . . . . This court finds nothing improper in this instruction . . . .

Finally, the [P]etitioner contends counsel was negligent in failing to object

to the actual verdict form provided to the jury and the actual verdict. [The] Petitioner contends that by listing (1) cruel and (2) torture, the jury failed to find any statutory aggravating circumstance. The court finds nothing improper in the charge or the verdict forms. . . . Moreover, the appellate courts reviewed the verdict on direct appeal and affirmed [the P]etitioner's conviction and sentence. Therefore, this court finds no negligence on the part of [the P]etitioner's trial counsel.

XVIII.  Sentencing Phase Opening Statement

[The] Petitioner contends counsel failed to give a meaningful opening statement during the penalty portion of the trial. . . . [T]rial counsel does lay out the [S]tate's burden to prove each aggravating circumstance beyond a reasonable doubt and further reminds the jury that they m[ust] find the aggravating circumstance or circumstances outweighs any mitigation they are provided. This court does not find counsel's performance fell so far below the standard of what is required as to be deemed ineffective. . . .

XIX.  Victim Impact Evidence

[The] Petitioner contends counsel should have objected to the abusive, unfairly prejudicial and cumulative victim impact proof. This allegation is wholly without merit. At trial, the [S]tate presented testimony from one victim impact witness. The full length of the testimony was less than two transcribed pages.

XX.  Sentencing Phase Closing Argument

[The] Petitioner contends counsel failed to present a meaningful closing argument during the sentencing phase of his trial. This court disagrees. Counsel clearly argued that the [S]tate had failed to meet its burden with respect to proving the aggravating circumstance. This allegation is without merit.

XXI.  Non-Statutory Mitigation

[The] Petitioner argues counsel was ineffective for failing to request a jury charge on non-statutory mitigation. This allegation has no merit. The trial court specifically charged the jury that they were to consider any and all mitigation that they found existed beyond the enumerated statutory factors.

XXII.  Ineffective Assistance on Appeal

[The] Petitioner contends counsel was ineffective on appeal. . . .

Having previously addressed each of these issues and having found counsel

was either not ineffective in failing to perform the requisite tasks or having found, even where counsel's performance was deficient, [the P]etitioner was not prejudiced by counsel's inaction, this court declines to address each of these issues as it relates to appellate counsel's representation.

## I.    Standard of Review

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The petition challenging Petitioner Bland's convictions is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. *See* T.C.A. § 40-30-110(f) (2006). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003); *Nichols v. State*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. *Id*. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id*. (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a petitioner constitutionally deficient assistance present mixed questions of law and fact. *Wallace*, 121 S.W.3d at 656; *Nichols*, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a *de novo* standard, "accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). *Id*. at 456.

## II.    Ineffective Assistance of Counsel

### A.    Legal Standard

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." *Gideon*

*v. Wainwright*, 372 U.S. 335, 340, 83 S. Ct. 792, 802 (1963) (citation omitted). Inherent in the right to counsel is the right to effective assistance of counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S. Ct. 1708, 1716 (1980); *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 1449 (1970); *see also Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S. Ct. at 2064; *Combs v. Coyle*, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687, 104 S. Ct. at 2064; *see also Combs*, 205 F.3d at 277.

The performance prong of the *Strickland* test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *see also Kimmelman v. Morrison*, 477 U.S. 365, 386, 106 S. Ct. 2574, 2588 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Combs*, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). Notwithstanding, it is the duty of this court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." *Id*. at 785, 107 S. Ct. at 3121.

If the petitioner shows that counsel's representation fell below a reasonable standard, then

the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 844 (1993) (citing *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064). That is, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the defendant of a fair trial and called into question the reliability of the outcome. *Nichols*, 90 S.W.3d at 587. For example, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an acquittal. *Nealy v. Cabana*, 764 F.2d 1173, 1178-79 (5th Cir. 1985); *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir. 1986). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence satisfies the second prong of *Strickland*." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); *see also Chambers v. Armontrout*, 907 F.2d 825, 832 (8th Cir. 1990), *cert. denied*, 498 U.S. 950, 111 S. Ct. 369 (1990). Moreover, when challenging the imposition of a sentence of death, the petitioner must show that "there is a reasonable probability that, absent the errors of counsel, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Henley*, 960 S.W.2d at 579-80 (citing *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

## B. Guilt Phase Deficiencies

The Petitioner raises numerous complaints that trial counsel, Patricia Odell and William Johnson, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions. In this regard, the Petitioner asserts that trial counsel denied him effective assistance of counsel at the guilt phase of his capital trial by breaching acceptable standards for capital representation in that:

1.  Counsel failed to formulate any defense or theory of defense;
2.  Counsel failed to interview and investigate potential witnesses;
3.  Counsel failed to have a mental evaluation performed on the Petitioner;
4.  Counsel failed to conduct a thorough voir dire;
5.  Counsel failed to file proper motions;
6.  Counsel failed to make proper opening and closing statements; and
7.  Counsel failed to request jury instructions and/or object to improper jury instructions.

### 1.    Counsel failed to form any defense or theory of defense

The Petitioner asserts that there was ample proof from which a defense theory could be made. He contends that, despite this proof, trial counsel failed to develop and pursue a comprehensive defense theory for the guilt/innocence phase of his capital trial. Within this claim, the Petitioner

strongly criticizes the inexperience of counsel, Patricia Odell. In this regard, he asserts that she was ineffective in failing to move the court to relieve her considering her total lack of experience in capital murder trials. The Petitioner adds that Ms. Odell's lack of experience "resulted in a situation where only one attorney (from a practical standpoint) had any purported qualification to defend this man."

At the post-conviction hearing, both Ms. Odell and Mr. Johnson recognized that the Petitioner's defense was limited. They proceeded on a theory that the Petitioner did not intend to kill the victim and, thus, was not guilty of premeditated murder. The lower court determined that, based on the facts of the crime, including the fact that the "[P]etitioner shot the victim in the leg at least five times at relatively close range to the point that witnesses described the victim's leg as looking like 'ground hamburger meat' . . .", trial counsel was not ineffective in failing to advance other defense theories, including an argument that the murder was one of voluntary manslaughter or reckless homicide. The lower court further determined that, based upon the proof presented at the post-conviction hearing, defense counsel was not ineffective for failing to present proof of mental retardation or diminished capacity. We agree.

This court is unable to conclude that the Petitioner's trial counsel were ineffective based on this claim. The Petitioner did not advance any other reasonable theory of defense at the post-conviction hearing. The Petitioner has not met the requirements to be granted post-conviction relief on this issue.

On appeal, the Petitioner also attacks Ms. Odell's qualifications to represent a capital defendant. Ms. Odell was appointed to represent the Petitioner in June 1993. Her appointment was prior to the effective date of the standards for appointment of counsel contained in the current version of Rule 13, Rules of the Tennessee Supreme Court. Prior to July 1, 1997, no qualifying criteria was specified as to lead counsel. Moreover, while the ABA standards as to capital representation were in place at the time of the appointment, and, while it must be conceded that Ms. Odell failed to satisfy the suggested criteria established by the ABA, these guidelines are not binding upon the trial courts of this state. There is no authority that the aspirational qualifications of counsel in a capital trial set forth in the ABA standards or that the required qualifications of capital counsel set forth in Rule 13, Rules of the Tennessee Supreme Court, are constitutionally compelled. *See generally Trent Starks v. State*, No. W2005-02478-CCA-R3-PC (Tenn. Crim. App., at Jackson, Nov. 2, 2006), *perm. app. denied* (Tenn. Mar. 5, 2007). The Fourteenth Amendment guidelines simply require the appointment of an attorney to a capital defendant. While the Tennessee Supreme Court has put into place heightened requirements in Rule 13, including the requirements of two attorneys that meet certain specific eligibility criteria, the attorneys need not meet these stringent standards to pass constitutional muster. *Id*.

While the Sixth Amendment does not grant a defendant the right to counsel of his own choice, since *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976), it has become apparent that special skills are necessary to assure adequate representation of defendants in death penalty cases. *See* ABA, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,* at

5.1. Notwithstanding this fact, there is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case. *Russell v. State*, 849 So.2d 85, 122 (Miss. 2003). In other words, lack of experience does not equate to *per se* deficient performance. A successful claim of ineffectiveness requires more than just a showing that counsel was inexperienced. The Petitioner must demonstrate with specificity that counsel made errors so serious that counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment and that such errors prejudiced the defense. We proceed, therefore, to examine the Petitioner's specific allegations of deficient performance.

### 2. Counsel failed to interview and investigate potential witnesses

Next, the Petitioner complains that trial counsel failed to properly investigate by failing to identify, locate, and interview all relevant witnesses, including but not limited to: persons who were in contact with the Petitioner around the time of the crime, persons who were in contact with key State's witnesses at or near the time of the crime, the State's witnesses at or near the time of the crime, the State's witnesses against the Petitioner, and law enforcement officers involved in every stage of the investigation of this offense. Specifically, the Petitioner complains:

> **(a) Trial counsel failed to interview the Petitioner's co-defendants concerning the Petitioner's role in the especially aggravated robbery**

The Petitioner complains that trial counsel never interviewed either Robert D. Davenport or Darryl Bailey, both co-defendants of the Petitioner. He asserts that had counsel interviewed these two men, they would have been able to formulate a stronger case for the Petitioner, both for negotiation purposes and for trial. At the post-conviction hearing, Robert D. Davenport testified that the Petitioner was not involved in the robbery discussion held at Charles Sanders' apartment. He added that the Petitioner was not among the men who jumped on the two men in the first car. However, the Petitioner did confront Ontrain Sanders, the man in the Cadillac. Darryl Bailey agreed with Robert D. Davenport that the Petitioner was not involved in the preliminary discussion about a robbery. He explained that, after the robbery was planned, "two dudes come over going to see some lady" and "the robbery went on. . . ." He stated that there was fighting with these two men, then another Cadillac pulled up, and the Petitioner was involved in a confrontation with this man. Darryl Bailey testified that the Petitioner "had come out the house [and] he shot him in the leg. . . ." While the victim was trying to get away, the Petitioner followed him around the corner, and more gun shots were heard. Darryl Bailey denied that the Petitioner was present when the first two men were jumped. He stated that, although the Petitioner's attorneys had not attempted to speak with him, if they had, he probably would not have talked with them.

Neither Mr. Davenport nor Mr. Bailey denied the fact that the Petitioner shot the victim. The lower court acknowledged that Mr. Bailey would not have spoken with the Petitioner's trial counsel even if they had approached him. The lower court found Mr. Davenport's statement that he would have discussed the case with the Petitioner's attorneys not credible. There is no revelation in either

of these two men's testimony that would have altered the Petitioner's culpability for the first degree murder conviction. We also note that, prior to his trial, the Petitioner acknowledged that he did not provide counsel the names of any persons who could serve as witnesses at the guilt or sentencing phases of the trial. While both men maintained that the Petitioner was not involved in the discussions concerning the robbery and that the Petitioner was not present at the time of the initial confrontation with the two robbery victims, Nugent and Norman, they said that the Petitioner, after fatally shooting Ontrain Sanders, returned to the original scene and shot Nugent in both legs as the co-defendants continued robbing them. The Petitioner fails to establish how either the testimony of Mr. Davenport or Mr. Bailey would have bolstered the Petitioner's defense against the especially aggravated robbery charge. Based upon the proof presented at the Petitioner's original trial, we cannot conclude that trial counsel was ineffective for failing to investigate co-defendants Davenport and Bailey.

### (b) Trial counsel failed to investigate the police officers and lay witnesses available to prepare, develop, and present meaningful guilt phase arguments for a lesser-included offense

The Petitioner also challenges trial counsel's failure to investigate police officers and lay witnesses. Officer Richard David Roleson testified at the Petitioner's post-conviction hearing that a person shot in the leg is less likely to die. He added that police officers are taught to shoot in the center of a body in order to kill an individual. The Petitioner's uncle, Rickey Bland, testified that there were two types of persons that carry guns, "killers" and "non-killers." He explained that a non-killer will shoot below the waist because he does not intend to kill the person, whereas a killer will shoot above the waist. The Petitioner asserts that trial counsel should have elicited this information prior to trial in order to assist with a defense theory. Specifically, the Petitioner contends that this testimony would have established that the Petitioner did not have the requisite premeditation to be convicted of first degree murder.

This court remains unconvinced that introduction of this testimony at the Petitioner's trial would have changed the outcome of the trial. The Petitioner has consistently maintained, including in his statement presented to the jury, that he was not shooting to kill and that was why the Petitioner shot the victim in the leg. The issue was already before the jury. We also remain unconvinced that trial counsel was ineffective for failing to hire an independent investigator for the purpose of interviewing potential witnesses. The Petitioner is not entitled to relief on this claim.

### 3. Counsel failed to secure a mental evaluation and to have an expert examine the Petitioner

The Petitioner challenges trial counsel's failure to obtain a mental health expert to evaluate his mental health, intelligence, and social background in order to support defense arguments for lesser included offenses and diminished capacity to rebut the intent element of first-degree murder in the guilt phase and to bolster mitigation evidence in the penalty phase. The Petitioner contends that if counsel had investigated the Petitioner's mental health, they would have discovered his below

average functioning. The Petitioner argues that had counsel submitted this information to the jury in both the guilt and the penalty phases, there is a reasonable probability the outcomes in these stages of the trial would have been different.

The post-conviction court determined that the Petitioner had failed to prove his entitlement to relief on this claim. Specifically, the Petitioner's own expert testified that the Petitioner had a full scale I.Q. of 85. The lower court noted that "this level of functioning is well above mental retardation." The court further observed that the Petitioner's expert, Dr. Angelillo, testified that the Petitioner's "symptoms could just as likely fit a[ ] sociopath pathology." The lower court reasoned that "[s]uch information would just as likely have been damaging to mitigation as helpful."

Ms. Odell testified that a report by Dr. Parr indicated that the Petitioner had "a very strong antisocial orientation." The report further reflected that the Petitioner was "very narcisstic in orientation and typically utilitarian and manipulative in his relationships with other people." Mr. Johnson testified that he was aware that the Petitioner had scored an I.Q. of 60 on one test and an I.Q. of 85 on another. He explained that he was unsure as to whether the Petitioner had any mental impairment. However, he observed that the Petitioner was able to converse, was articulate, and understood what was going on. Mr. Johnson stated that, based upon their observations, the defense team relied upon the higher I.Q. score.

Counsel and their investigator spoke with the Petitioner and his family members. There was no indication that the Petitioner was functioning at an impaired level or that he suffered in any way from any mental defects. A lawyer may make reasonable decisions that render particular investigations unnecessary. A review of the record indicates that trial counsel's decisions not to employ a mental health expert were reasonable considering the information amassed by counsel through their investigation. Accordingly, counsel were not deficient in their investigation in this matter. The Petitioner is not entitled to relief on this issue.

### 4. Counsel failed to conduct a thorough voir dire

Next, the Petitioner argues that counsel did not conduct a meaningful or effective voir dire on any topic. The Petitioner presented the testimony of Gerald Skahan at the post-conviction hearing. Mr. Skahan testified that "there is not [a] situation where you would not voir dire the jury on death." The Petitioner asserts that "[h]ad counsel conducted a thorough voir dire, there is a reasonable probability the verdicts would have been different." He specifically targets counsel's failure to ask any questions concerning the death penalty, *i.e.*, death qualification, life-qualification, and issues of race. The Petitioner also challenges trial counsel's failure to object to the prosecution's inappropriate voir dire that amounted to argument rather than questions.

The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. *State v. Mann*, 959 S.W.2d 503, 533 (Tenn. 1997), *reh'g denied*, (1998), *cert. denied,* 524 U.S. 956, 118 S. Ct. 2376 (1998); *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994). There is no constitutional right that a defendant is entitled to have questions posed to the venire specifically

-44-

directed to matters that conceivably might prejudice veniremen against him. *Ristaino v. Ross*, 424 U.S. 589, 594, 96 S. Ct. 1017, 1020 (citing *Ham v. South Carolina*, 409 U.S. 524, 527-28, 93 S. Ct. 848, 850 (1973)). Moreover, in the capital murder context, where the jury in the punishment phase must choose between life and death, several courts have held that not questioning as to whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. *Hartman v. State*, 896 S.W.2d 94, 105 (Tenn. 1995); *see also Stanford v. Parker*, 266 F.3d 442, 453-54 (6th Cir. 2001); *Commonwealth v. Morris*, 684 A.2d 1037, 1042-43 (Pa. 1996).

This court has reviewed the transcript of the voir dire. We cannot conclude that the Petitioner's trial was rendered fundamentally unfair due to trial counsel's failure to ask specific questions. Each of the jurors ultimately impaneled made unqualified assertions that they could be fair and impartial. The transcript before this court does not demonstrate any fundamental unfairness in the conduct of the trial. "[W]here a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [d]efendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn.), *cert. denied*, 510 U.S. 979, 114 S. Ct. 475 (1993).

In the present case, the Petitioner has failed to establish that he was not provided a trial cloaked with guarantees of fundamental fairness. The record reveals that both the trial court and the prosecution informed the jury of the applicable legal burdens. The record also reveals that trial counsel did inquire as to the jurors' understanding of the State's burden of proof. The Petitioner has failed to present any specific proof to establish that trial counsel acted objectively unreasonable under the facts and circumstances of this case by not delving further into these issues during jury selection. Finally, the record is devoid of proof of prejudice that the Petitioner may have suffered in this regard, presuming that counsel's lack of questioning constituted deficient performance. Accordingly, we cannot conclude that trial counsel was deficient in performing an adequate voir dire. The Petitioner is not entitled to post-conviction relief on this claim.

### 5.    Counsel failed to file proper motions

The Petitioner next contends that trial counsel was ineffective for failing to file proper motions, including: (a) a motion for a pretrial *Morgan* hearing; and (b) pretrial motions challenging the constitutionality of the Tennessee death penalty statutes.

### (a)    *Morgan* hearing

The Petitioner contends that trial counsel was ineffective for failing to move the trial court to conduct a hearing to determine whether any prior convictions of the State could be used for the purpose of impeaching the Petitioner's testimony. *See State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976); *see also* Tenn. R. Evid. 609. The record from the Petitioner's trial reveals that he did not testify. The trial court conducted a voir dire colloquy in which the Petitioner affirmatively waived the right to testify in his own defense at the guilt phase of the trial.

The post-conviction court determined that trial counsel did, in fact, file a motion for a pre-trial *Morgan* hearing, but the motion was withdrawn on the day of trial. The post-conviction court surmised that counsel may have recognized that the Petitioner was not going to testify at the guilt phase and, therefore, such hearing was not necessary. In fact, the Petitioner did not testify at the guilt phase of the trial. As determined by the lower court, this court will not speculate as to whether defense counsel would not have renewed the request for a hearing had the Petitioner ultimately decided to take the stand on his own behalf. Moreover, such speculation is unnecessary, as the Petitioner did not testify at the guilt phase. Accordingly, the Petitioner is unable to establish that he was prejudiced by defense counsel's failure to request a *Morgan* hearing.

**(b)      Motions challenging the constitutionality of Tennessee's death penalty statutes**

The Petitioner next contends that defense counsel failed to file pretrial motions challenging the constitutionality of Tennessee's death penalty statutes. The Petitioner argues that, had counsel filed such motions, there is a possibility the indictment may have been dismissed and/or these constitutional issues would have been preserved in the record for consideration on appeal and in post-conviction. Specifically, the Petitioner contends that the following challenges were not made to the Tennessee death penalty statutes:

a.      The statutes provide insufficient guidance to the jury concerning what standard of proof the jury should use in making the determination that the aggravating circumstances outweigh the mitigating circumstances;

b.      The statutes do not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death;

c.      The statutes do not sufficiently limit the exercise of the jury's discretion, because once the jury finds the existence of one aggravating factor, it can impose a sentence of death no matter what evidence of mitigation is shown;

d.      The statutes limit the jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if it finds that the aggravating factors outweigh the mitigating factors, further making death mandatory;

e.      The statutes fail to ensure that non-statutory mitigating factors are given the same weight as statutory mitigating factors by not requiring that the jury be given written instructions on the equal weight of non-statutory mitigating factors;

f.      The statutes do not require the jury to make the ultimate determination that the appropriate punishment is a death sentence;

g.    The statutes do not require that the jury be instructed in writing that it may impose a life sentence on the basis of mercy alone;

h.    The statutes do not provide a way to correct, by written instructions or the presentation of evidence, jurors' common misperceptions regarding the actual terms of life sentences and death sentences, the cost of incarceration and the cost of executions, the death penalty's deterrent value, and the painful nature of death by electrocution;

i.    The statutes prevent effective review on appeal because they do not require the jury to make specific findings with respect to the presence or absence of mitigating factors;

j.    The statutes provide for a punishment, death, which is cruel and unusual. . . . Thus, it is a punishment which has become increasingly unusual and contrary to evolving standards of decency and human rights;

k.    The statutes provide for a method of execution, electrocution, which is cruel and unusual;

l.    The statutes are applied in a discriminatory manner – unfairly affecting racial, gender, geographic, economic and political classes;

m.    The statutes do not provide an adequate method for proportionality and arbitrariness review by the Tennessee Supreme Court;

n.    The statutes have been applied by prosecutors in a manner that abuses their discretion because the statutes do not provide uniform standards for application of the death sentence;

o.    The statutes have produced violations of the equal protection clauses of the state and federal constitutions because they do not provide uniform standards for qualifying jurors for service on capital juries;

p.    The statutes permit the introduction of unreliable evidence in support of aggravating factors and in rebuttal of mitigating factors;

q.    The statutes allow the [S]tate to make closing arguments to the jury in the penalty phase;

r.    The statutes do not require that the jury be instructed in writing regarding the consequences of its failure to reach a unanimous verdict in the penalty phase;

s.      The statutes require the jury to agree to a unanimous verdict in order to impose a life sentence;

t.      Execution by either electrocution or lethal injection is cruel and unusual punishment.

The post-conviction court noted that the Petitioner listed over twenty specific allegations, which he claims renders Tennessee's statutory scheme unconstitutional. A review of the transcript reflects that trial counsel did, in fact, challenge the constitutionality of the death penalty pretrial. Moreover, the Tennessee appellate courts have continuously addressed these claims and have found each to be without merit. Specifically,

a.      The statutes provide insufficient guidance to the jury concerning what standard of proof the jury should use in making the determination that the aggravating circumstances outweigh the mitigating circumstances. This contention was rejected in *Houston v. State,* 593 S.W.2d 267 (Tenn. 1980), overruled on other grounds by *State v. Brown*, 836 S.W.2d 550 (Tenn. 1992).

b.      The statutes do not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death, including the "heinous, atrocious, cruel" aggravating circumstance. The Tennessee Supreme Court has rejected this argument. *Terry v. State,* 46 S.W.3d 147, 159 (Tenn.), *cert. denied,* 534 U.S. 1023, 122 S. Ct. 553 (2001).

c.      The statutes do not sufficiently limit the exercise of the jury's discretion, because once the jury finds the existence of one aggravating factor, it can impose a sentence of death no matter what evidence of mitigation is shown. This argument was rejected by *State v. Smith,* 857 S.W.2d 1, 21-22 (Tenn. 1993); *see also Franklin v. Lynaugh,* 487 U.S. 164, 178-80, 108 S. Ct. 2320, 2330 (1988); *State v. Hurley,* 876 S.W.2d 57, 69 (Tenn. 1993), superseded by statute on other grounds as recognized in *State v. Price*, 46 S.W.3d 785 (Tenn. Crim. App. 2000).

d.      The statutes limit the jury's discretion to exercise mercy by requiring the jury to impose a sentence of death if it finds that the aggravating factors outweigh the mitigating factors, further making death mandatory. Specifically, our supreme court has repeatedly held that "'the statute, taken in its entirety, does not in any way unconstitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the Constitution.'" *State v. Bane,* 853 S.W.2d 483, 488 (Tenn. 1993) (quoting *State v. Boyd,* 797 S.W.2d 589, 596 (Tenn. 1990), *cert. denied,* 498 U.S. 1074, 111 S. Ct. 800 (1991)).

e.	The statutes fail to ensure that non-statutory mitigating factors are given the same weight as statutory mitigating factors by not requiring that the jury be given written instructions on the equal weight of non-statutory mitigating factors. This argument has been rejected in *State v. Bush*, 942 S.W.2d 489, 524 (Tenn. 1997).

f.	The statutes do not require the jury to make the ultimate determination that the appropriate punishment is a death sentence. This argument has likewise been rejected by our supreme court. *State v. Hall,* 958 S.W.2d 679, 718 (Tenn. 1997); *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn. 1994); *Smith,* 857 S.W.2d at 22.

g.	The statutes do not require that the jury be instructed in writing that it may impose a life sentence on the basis of mercy alone. Our appellate courts have consistently rejected the argument that the "mercy instruction" is required at a capital sentencing hearing. *State v. Cauthern,* 967 S.W.2d 726, 749 (Tenn. 1998); *State v. Bigbee,* 885 S.W.2d 797, 813-14 (Tenn. 1994), superseded by statute on other grounds as recognized in *State v. Odom*, 137 S.W.3d 572 (Tenn. 2004); *Cazes,* 875 S.W.2d at 269 n.6.

h.	The statutes do not provide a way to correct, by written instructions or the presentation of evidence, jurors' common misperceptions regarding the actual terms of life sentences and death sentences, the cost of incarceration and the cost of executions, the death penalty's deterrent value, and the painful nature of death by electrocution. This argument has been rejected by our supreme court. *Terry,* 46 S.W.3d at 170; *Brimmer,* 876 S.W.2d at 86-87; *Cazes,* 875 S.W.2d at 268; *State v. Black,* 815 S.W.2d 166, 179 (Tenn. 1991).

i.	The statutes prevent effective review on appeal because they do not require the jury to make specific findings with respect to the presence or absence of mitigating factors. In considering similar challenges, our supreme court has repeatedly held that the appellate review process is constitutionally adequate. *Hall,* 958 S.W.2d at 719; *State v. Smith,* 893 S.W.2d 908, 927 (Tenn. 1994); *Cazes,* 875 S.W.2d at 270-71; *State v. Harris,* 839 S.W.2d 54, 77 (Tenn. 1992); *State v. Barber,* 753 S.W.2d 659, 664 (Tenn. 1988).

j.	"The statutes provide for a punishment, death, which is cruel and unusual. . . . Thus, it is a punishment which has become increasingly unusual and contrary to evolving standards of decency and human rights." The Petitioner's argument that the death penalty by any means constitutes cruel and unusual punishment in violation of the state and federal constitutions has been repeatedly rejected by our appellate courts. *State v. Keen,* 31 S.W.3d 196, 233 (Tenn. 2000), *cert. denied,* 532 U.S. 907, 121 S. Ct. 1233 (2001);

*State v. Pike,* 978 S.W.2d 904, 925 (Tenn. 1998), *cert. denied,* 526 U.S. 1147, 119 S. Ct. 2025 (1999); *State v. Nesbit,* 978 S.W.2d 872, 902-03 (Tenn. 1998), *cert. denied,* 526 U.S. 1052, 119 S. Ct. 1359 (1999); *State v. Vann,* 976 S.W.2d 93, 118 (Tenn. 1998), *cert. denied,* 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Blanton,* 975 S.W.2d 269, 286 (Tenn. 1998), *cert. denied,* 525 U.S. 1180, 119 S. Ct. 1118 (1999); *State v. Cribbs,* 967 S.W.2d 773, 796 (Tenn. 1998), *cert. denied,* 525 U.S. 932, 119 S. Ct. 343 (1998); *Cauthern,* 967 S.W.2d at 751.

k.     The statutes provide for a method of execution, electrocution, which is cruel and unusual. This argument has been rejected. *See supra*.

l.     The statutes are applied in a discriminatory manner – unfairly affecting racial, gender, geographic, economic and political classes. This argument has been rejected by our supreme court. *State v. Thomas,*158 S.W.3d 361, 407 (Tenn. 2005); *State v. Hines,* 919 S.W.2d 573, 582 (Tenn. 1995); *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 23.

m.     The statutes do not provide an adequate method for proportionality and arbitrariness review by the Tennessee Supreme Court. Our supreme court has rejected this argument also. *Thomas,* 158 S.W.3d at 408; *State v. Reid,* 91 S.W.3d 247, 313 (Tenn. 2002); *Cazes,* 875 S.W.2d at 270-71. Moreover, our supreme court has held that, while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required. *Bland,* 958 S.W.2d at 663.

n.     The statutes have been applied by prosecutors in a manner that abuses their discretion because the statutes do not provide uniform standards for application of the death sentence. This argument has been rejected by our supreme court. *Thomas,* 158 S.W.3d at 407; *Hines,* 919 S.W.2d at 582.

o.     The statutes have produced violations of the equal protection clauses of the state and federal constitutions because they do not provide uniform standards for qualifying jurors for service on capital juries. This challenge has been rejected by our Supreme Court in *Reid*, 91 S.W.3d at 313.

p.     The statutes permit the introduction of unreliable evidence in support of aggravating factors and in rebuttal of mitigating factors. This argument has been rejected in *Bush*, 942 S.W.2d at 524.

q.     The statutes allow the [S]tate to make closing arguments to the jury in the penalty phase. This argument has been rejected. *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 269; *Smith,* 857 S.W.2d at 24; *Caughron,* 855 S.W.2d

at 542.

r.    The statutes do not require that the jury be instructed in writing regarding the consequences of its failure to reach a unanimous verdict in the penalty phase. This argument has been rejected by our supreme court. *Terry,* 46 S.W.3d at 170; *Brimmer,* 876 S.W.2d at 87; *Cazes,* 875 S.W.2d at 268; *Smith,* 857 S.W.2d at 22-23.

s.    The statutes require the jury to agree to a unanimous verdict in order to impose a life sentence. This argument has been repeatedly rejected. *State v. Ivy,* 188 S.W.3d 132, 163 (Tenn. 2006) (citing *Brimmer,* 876 S.W.2d at 87); *State v. Thompson,* 768 S.W.2d 239, 250 (Tenn. 1989); *King,* 718 S.W.2d 241, 249 (Tenn. 1986), *superseded by statute as recognized by State v. Hutchinson,* 898 S.W.2d 161 (Tenn. 1994).

t.    The Petitioner argues that lethal injection is cruel and unusual punishment. Our supreme court has rejected this claim in *State v. Banks*, 271 S.W.3d 90, 108 (Tenn. 2008), and *Abu-Ali Abdul Rahman v. Bredesen,* 181 S.W.3d 292, 307-310 (Tenn. 2005). We further acknowledge that the United States Supreme Court rejected a constitutional challenge of Kentucky's standard three-drug lethal injection protocol in *Baze v. Rees*, -- U.S. --, 128 S. Ct. 1520, 1528 (2008).

Accordingly, trial counsel's failure to preserve these issues for direct appeal cannot be deemed prejudicial. The Petitioner is not entitled to relief on this issue.

### 6.    Counsel delivered inadequate opening and closing statements

The Petitioner contends that trial counsel was ineffective for failing to include in their opening and closing argument any argument of fact, law, or defense. The lower court disagreed, concluding that counsel "emphasized in both opening and closing argument the presumption of innocence, the State's burden of proof and reasonable doubt and argued that the State either would not be able to meet their burden or had failed to meet their burden retrospectively." The lower court determined that the content of opening and closing statements was within the reasoned trial strategy of counsel and that the court would not second guess their decisions.

The right to effective assistance of counsel extends to opening and closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); *Bell v. Cone*, 535 U.S. 685, 701-02, 122 S. Ct. 1843, 1853 (2002). Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 2555 (1975), but which issues to sharpen and how best to

clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forego closing argument altogether. *Bell*, 535 U.S. at 701-02, 122 S. Ct. 1843. Judicial review of a defense attorney's summation is therefore highly deferential and doubly deferential when it is conducted in hindsight. *Yarbrough* 540 U.S. at 5-6, 124 S. Ct. at 4.

In the present case, during her opening argument, Ms. Odell stressed the fact that the prosecutor's argument was merely argument. She advised the jury that they were to obtain the facts from the proof that would come from the witnesses. She emphasized that the State must prove each and every element of the crime and that the jury was bound to follow the law provided by the trial court. In closing argument, Mr. Johnson again focused on the State's burden of proof and that the State must prove each and every element beyond a reasonable doubt. He asked the jury to be fair and open minded. Mr. Johnson reiterated the elements of premeditated murder and focused on the element of premeditation. Mr. Johnson also referred to the offense of reckless homicide. While we agree that counsel's arguments failed to set forth any facts of the crimes or a specific defense theory, we cannot conclude that, had counsel done so, a different result would have occurred. Additionally, as the trial court properly instructed the jury as to the elements of the offenses, we cannot conclude that counsel's opening and closing statements constituted prejudicial error. The Petitioner is not entitled to relief on this claim.

### 7. Counsel failed to request certain jury instructions

#### (a) Burden of Proof

The Petitioner contends that trial counsel was ineffective by failing to request special jury instructions. Specifically, he argues that counsel failed to request a proper jury instruction for the guilt phase burden of proof and, in the alternative, failed to object to the improper instruction provided by the trial court. The Petitioner complains that, at the guilt phase of the trial, no specific instruction regarding the burden of proof was provided to the jury. The Petitioner asserts that the appropriate jury charge on the burden of proof was as follows:

> [T]he [S]tate has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden never shifts but remains on the [S]tate throughout the trial of the case. The defendant is not required to prove his innocence.

T.P.I. Crim. 2.02 (4th ed. 1995). The instruction provided to the jury at the beginning of jury selection by the trial court provided:

> The inquiry by the lawyers has no relation whatsoever whether the defendant is guilty or not guilty of the offense charged. As he sits before you, he is presumed to be innocent. The State must prove his guilt to you beyond a reasonable doubt and to a moral certainty before you can find him guilty of anything.

During jury selection, the trial court again stated that the State "has the burden of

-52-

proof in criminal cases" and that it "must prove the defendant guilty beyond a reasonable doubt and to a moral certainty." During both the Petitioner's opening and closing statements, defense counsel reiterated that the State bore the burden of proving the case beyond a reasonable doubt. During the jury charge, the trial court instructed the jury for the felony murder charge that "the [S]tate must have proven beyond a reasonable doubt the existence of" the elements of the offense. On the premeditated murder charge, the trial court instructed, "If you find from the proof beyond a reasonable doubt that the defendant is guilty of murder in the first degree, you will so report your verdict." The court further instructed on the presumption of innocence and reasonable doubt.

At the post-conviction hearing, the lower court determined that the trial court instructed that the State bore the burden of proving each element of the offense beyond a reasonable doubt. The lower court determined that, because counsel had an obligation to specifically request the pattern instruction regarding the burden of proof and to object to any instruction that did not include a proper burden of proof instruction, trial counsel was deficient. However, the trial court further determined that the deficiency did not prejudice the Petitioner as the jury essentially received a complete instruction.

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S. Ct. 1239, 1242 (1994). Furthermore, "so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, . . . [t]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* (citations omitted). In viewing the numerous times the trial court advised the jury of the burden of proof, we conclude that the trial court "sufficiently described the degree of doubt necessary for acquittal and the degree of proof necessary for conviction." *See Pettyjohn v. State,* 885 S.W.2d 364, 365 (Tenn. Crim. App. 1994). Accordingly, we cannot conclude that the Petitioner was prejudiced by trial counsel's failure to request the pattern jury instruction or counsel's failure to object to the trial court's failure to provide said instruction.

### (b)    "Deliberation" instruction

Next, the Petitioner contends that the trial court improperly instructed the jury regarding "deliberation" in the charge related to first degree premeditated murder. During the trial, the court instructed the jury as follows:

The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect.

Citing *State v. West*, 844 S.W.2d 144, 147 (Tenn. 1992), the Petitioner argues that "deliberation . . . requires that the killing be done with a cool purpose – in other words, that the killer be free from the passions of the moment." The Petitioner complains that trial counsel neither raised an objection at trial nor cited this error in the motion for new trial. He further complains that counsel failed to raise this issue on appeal.

On direct appeal, a panel of this Court noted:

Although not raised as an issue on this appeal, we note that the trial court's jury instructions included in the technical record contained an arguably misleading and partially erroneous instruction concerning the element of deliberation. Among other instructions, the jury was told, "The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation, *it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect.*" (emphasis added). This instruction is somewhat confusing and appears to be out of context. We do not believe the emphasized phrase should have been included. *See State v. Brooks,* 880 S.W.2d 390 (Tenn. Crim. App. 1993). However, the charge in the case *sub judice* did not include other problematic instructions noted by this Court in *Brooks*. Also, this Court further noted in *Brooks* that, "because the evidence from the record could either support or fail to support a finding of deliberation, we cannot conclude that the erroneous jury instructions were harmless." *Id.* at 393. In the case *sub judice,* overwhelming evidence supports a finding of deliberation. *Brooks* is clearly distinguishable on its facts and the questioned instruction. We conclude that any error in the trial court's instructions concerning deliberation was harmless.

*State v. Andre Bland*, No. 02C01-9412-CR-00281 n.11 (Tenn. Crim. App., at Jackson, Mar. 27, 1996). Despite this holding by this court, the Petitioner complains that counsel was ineffective for failing to raise the issue before the Tennessee Supreme Court. While it is apparent that counsel was deficient in failing to object to the instruction and for failing to raise the issue on appeal, the Petitioner is unable to establish that he was prejudiced by the deficiency. The Petitioner cannot establish that a different outcome would have resulted at trial had a more appropriate definition of "deliberation" been given. The Petitioner is not entitled to relief on this claim.

**(c)  Defense of ignorance or mistake of fact instruction**

The Petitioner asserts that trial counsel's performance was deficient and prejudicial in that counsel failed to request a jury instruction for the defense of ignorance or mistake of fact. The Petitioner asserts that the proof was available to the defense and could have been presented to the jury through both expert and lay testimony.

"[I]gnorance or mistake of fact is a defense to prosecution if such ignorance or mistake negates the culpable mental state of the charged offense." T.C.A. § 39-11-502(a) (2003). The trial court must instruct the jury on the defense if it is fairly raised by the proof. T.C.A. § 39-11-203(a), (c) (2003). The Sentencing Commission Comments provide that ignorance or mistake of fact "is a narrow defense." T.C.A. § 39-11-502, Sentencing Comm'n Comments. The proof at the Petitioner's trial did not fairly raise this defense.

However, the premise of the Petitioner's argument appears to focus on the fact that trial counsel failed to introduce evidence of "ignorance or mistake of fact." The facts of the crime belie any proof of "ignorance or mistake of fact." The Petitioner relies upon proof that he did not intend to kill the victim because he shot at his legs. The Petitioner also relies upon fragmented evidence of a possible mental impairment. The fact that the Petitioner chased the victim underneath a vehicle and then fired multiple rounds at the victim's legs belies any "ignorance or mistake of fact." When a defendant employs a deadly weapon against another in a deadly manner, we can only conclude that he intends a deadly result of his action. The jury was instructed as to lesser offenses of first degree murder with less culpable mental states. The jury rejected these lesser offenses. The Petitioner has failed to show that he was prejudiced by counsel's failure to introduce proof of ignorance or mistake of fact. The Petitioner is not entitled to relief on this claim.

### (d)     Negligent homicide

In his final challenge to jury instructions, the Petitioner contends that trial counsel failed to request a proper jury instruction for the offense of negligent homicide. He argues that trial counsel failed to develop witnesses in order to support this theory. Counsel failed to present evidence of the Petitioner's limited intelligence and of his personal experience of a wound to the leg.

The post-conviction court concluded that other lesser included offenses were charged and the jury found the Petitioner guilty of the greater charge. Accordingly, the post-conviction court concluded that any failure on part of trial counsel to request an instruction as to negligent homicide did not result in prejudice to the Petitioner.

The jury convicted the Petitioner of first degree murder as charged, rejecting the lesser homicide charges instructed. Intervening lesser included offenses were offered. The result would not have been different had criminally negligent homicide been charged. *See State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998) (any error in failing to instruct on lesser offense was harmless where jury instructed on intervening lesser but convicted defendant as charged). We cannot conclude that the Petitioner was prejudiced as a result of counsel's failure to request an instruction on negligent homicide. The Petitioner is not entitled to relief on this issue.

### C.     Penalty Phase Deficiencies

The Petitioner raises numerous complaints regarding trial counsel's performance during the penalty phase of his capital trial. Specifically, the Petitioner contends that trial counsel, Patricia

Odell and William Johnson, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions, in that:

1. Counsel failed to interview and investigate potential witnesses for mitigation;
2. Counsel failed to retain a mitigation expert;
3. Counsel failed to request certain jury instructions; and
4. Counsel failed to inspect or request a valid jury verdict form and failed to object to the improper jury verdict form.

### 1.        Counsel failed to interview potential witnesses for mitigation

The Petitioner contends that trial counsel failed to talk with other family members and other individuals familiar with the Petitioner's life in order to put forth a more accurate social history and life story of the Petitioner during the penalty phase of trial. He maintains that counsel had a duty to talk with all of his family members in order to get the full story of his life history.

In the context of capital cases, a defendant's background, character, and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 98 S. Ct. 2954, 2964 (1978) (plurality opinion); *Zagorski v. State*, 983 S.W.2d 654, 657-58 (Tenn. 1998). The right that capital defendants have to present a vast array of personal information in mitigation at the penalty phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. *Goad v. State*, 938 S.W.2d 363, 369-70 (Tenn. 1996).

Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2052. In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's prospective at the time. *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S. Ct. 2527, 2536 (2003) (citations omitted). Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would

assist the defendant at sentencing. *Id.* at 533, 121 S. Ct. at 2541. Neither is counsel required to interview every conceivable witness. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. *Washington v. Watkins*, 655 F.2d 1346, 1356 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. *Babbit v. Calderson*, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). In summary, "no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel." Rather, "courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential." *Roe v. Flores-Ortega*, 528 U.S. 470, 477, 120 S. Ct. 1029, 1034-35 (2000) (internal citations and quotations omitted).

To determine whether or not trial counsel was ineffective for failing to present mitigating evidence, the reviewing court must consider several factors:

1.    The reviewing court must analyze the nature and extent of the mitigating evidence that was available but was not presented. *Goad*, 938 S.W.2d at 371 (citing *Deutscher v. Whitley*, 946 F.2d 1443 (9th Cir. 1991); *Stephens v. Kemp*, 846 F.2d 642 (11th Cir. 1988); *State v. Adkins*, 911 S.W.2d 334 (Tenn. Crim. App. 1994)*; Cooper v. State*, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992)).

2.    The court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. *Goad,* 938 S.W.2d at 371 (citing *Atkins v. Singletary*, 965 F.2d 952 (11th Cir. 1992), *cert. denied*, 515 U.S. 1165, 115 S. Ct. 2624 (1995); *Clozza v. Murray*, 913 F.2d 1092 (4th Cir. 1990), *cert. denied*, 499 U.S. 913, 111 S. Ct. 1123 (1991); *State v. Melson*, 772 S.W.2d 417, 421 (Tenn. 1989)).

3.    The court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. *Goad,* 938 S.W.2d at 371 (citing *Fitzgerald v. Thompson*, 943 F.2d 463, 470 (4th Cir. 1991), *cert. denied*, 502 U.S. 1112, 112 S. Ct. 1219 (1992); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987), *cert. denied*, 485 U.S. 1014, 108 S. Ct. 1487 (1988)).

During the penalty phase of his trial, the Petitioner presented the testimony of his mother, Marilyn Boyd; his grandmother, Virginia Bland; and himself. Their testimony revealed that the Petitioner had never known his biological father and that he was raised by his mother and grandmother. Both Marilyn Boyd and Virginia Bland testified that the Petitioner had turned himself in to the police at their urging. The Petitioner had dropped out of high school in the eleventh grade, when he was suspended for being "disrespectful to a teacher." He had a juvenile record beginning

at the age of eleven, consisting of multiple assaults and batteries, car thefts, and at least one drug conviction. The defendant testified that he shot the victim because the victim ran back to his car as if he was "fixing to get his gun or something;" that he did not know why he and Darryl had followed the victim; that he had been drinking and the crime was a spur of the moment decision; and that the victim was shot several times because the automatic gun "kept on repeating shots." He expressed remorse and repeated that he was not trying to kill the victim. The Petitioner also admitted that he carried a gun because he sold drugs and that he had been selling drugs on the night of the killing.

The only aggravating circumstance was the (i)(5) factor, "[t]he murder was especially heinous atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." T.C.A. § 39-13-204(i)(5) (2003). The jury found that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt and, as a result, sentenced the Petitioner to death.

We summarize the mitigating evidence presented at the post-conviction evidentiary hearing as follows:

1. **Virginia Bland, grandmother**. In addition to the testimony she provided during the penalty phase, Virginia Bland testified regarding the decay of the LeMoyne Gardens neighborhood. She stated that the Petitioner moved with his family into a home in Germantown. The family had plenty of money, and the Petitioner was doing well in school. This ended when the Petitioner's stepfather, Mitchell Boyd, Sr., was arrested, convicted, and sentenced to federal prison. Virginia Bland detailed an incident when the Petitioner was pistol whipped and another incident when the Petitioner was shot in both legs. Both incidents required hospitalization. Virginia Bland stated that the Petitioner discovered the body of a murder victim in the apartment building. She stated the Petitioner was remorseful for the killing of Ontrain Sanders. She testified that the Petitioner had a child. She further testified that, at the time of his arrest, the Petitioner was living in her three-bedroom apartment with approximately twelve other family members.

2. **Marilyn Boyd, mother**. In addition to the testimony she provided during the penalty phase, Marilyn Boyd stated that she was married to Mitchell Boyd, Sr. In 1985, Mitchell Boyd, Sr., moved the family, including the Petitioner, into a two-story home in Germantown. Mitchell Boyd, Sr., paid $200,000 for the home. There were no drugs, no crimes, and no prostitution in the Germantown neighborhood where the family lived for three and one-half years. In 1987, Mitchell Boyd, Sr., was arrested, and the family eventually had to move out of the Germantown home. They relocated to the Hickory Hill area. Eventually, the family moved back into the Whitehaven neighborhood. It was at this time that the Petitioner began getting into trouble, and his grades began to fall at school. Marilyn Boyd stated that she had heard that the Petitioner was selling drugs. She was aware that her brothers sold drugs. She admitted that her husband, Mitchell Boyd, Sr., went to federal prison for selling drugs on a "big time scale." Mitchell Boyd, Sr., was murdered in Washington, D.C., after being released from federal prison. As did her mother, Marilyn Boyd described two incidents, one in which the Petitioner had been pistol whipped and another when he had been shot in the legs.

3. **Irish Rutherford, family friend**. Irish Rutherford described the crime in the LeMoyne Gardens area. She stated that the Petitioner was "a nice young boy" and that he was sorry for what he had done.

4. **Rose Tatum, aunt.** Rose Tatum testified that the Petitioner was always respectful of her. She stated that the Petitioner "feels that he has been rehabilitated."

5. **Teresa Wiggs, mother of the Petitioner's child.** Teresa Wiggs stated that, at the time of the Petitioner's arrest, she was his girlfriend. The Petitioner's son was born on August 26, 1993, six months prior to the Petitioner's trial. She recalled that, on the night of the incident, the Petitioner came to her apartment. He was crying and kept repeating that "he didn't try to hurt anybody."

6. **Rickey Bland, uncle**. Rickey Bland described the Germantown neighborhood that the Petitioner had lived in as "crime free." He acknowledged that the Petitioner's stepfather "made a lot of money" by selling drugs. He further acknowledged that when the family lived in the Germantown house, they drove a Mercedes, a BMW, and a Porsche. Rickey Bland stated that Mitchell Boyd, Sr., was one of the biggest drug dealers in Memphis. Upon Mitchell Boyd, Sr.'s conviction, the family went from "riches to rags." The family ultimately moved into the Briarsgate Apartments, an area Rickey Bland described as "rough." People were being robbed, shootings were going on nearby, and homes were being burglarized. He stated that one always had to be on guard. Rickey Bland stated that three of his four brothers were drug dealers. Two of his brothers had been shot. Rickey Bland also sold drugs. Rickey Bland described the incident in which the Petitioner was pistol whipped and the incident in which the Petitioner was shot. After the shooting incident, the Petitioner began carrying a weapon and began selling drugs. He also described the differences between "killers" and "non-killers." Rickey Bland stated that he loved the Petitioner with all his heart. He also stated that the Petitioner was very upset over the incident and turned himself in to make things right.

7. **Perinta Bland, brother.** Perinta Bland barely recalled when their stepfather was arrested and sent to prison. He described the Briarsgate Apartments as being a violent area. He stated that the Petitioner discouraged him from the drug trade and tried to keep him away from crime.

8. **Travis Bland, uncle**. Travis Bland testified that he and the Petitioner were very close. He stated that he sold drugs until he was shot.

9. **Carolyn Jackson, family friend.** Carolyn Jackson also lived in LeMoyne Gardens. She described the area as a very rough neighborhood. She stated that there were drugs on every corner. Carolyn Jackson stated that she loved the Petitioner. Ms. Jackson had visited the family when they lived in Germantown. She acknowledged that Marilyn Boyd's husband, Mitchell Boyd, Sr., "sold a little drugs." When Mitchell Boyd, Sr., went to prison, the family could no longer afford the Germantown house so they moved back into the Kingsgate Apartments. She stated that, in this neighborhood, people sold drugs, broke into homes, and had fights. Or, as she described it, things "the average teenager would do." Ms. Jackson testified that the Petitioner's biological father was

an alcoholic and eventually died of cirrhosis. It was Mitchell Boyd, Sr., who was the father figure to the Petitioner. Ms. Jackson stated that the Petitioner should not be on death row.

10. **Kevin Smith, friend.** Kevin Smith stated that the Petitioner was his best friend. He had visited the Petitioner at the Germantown house. He stated that there was no crime and no drug dealers in Germantown. When the family moved back to the Briarsgate Apartments, he and the Petitioner were able to spend more time together. Kevin Smith stated, however, that this area was crime-ridden and that one could commonly see women prostituting themselves. Kevin Smith was present when the Petitioner was pistol whipped. After this incident, the Petitioner told Smith, "That was the last time something like that was going to happen." Smith also recalled the incident in which the Petitioner was shot in the legs.

11. **Sandra Bland, aunt.** Sandra Bland stated that the Petitioner's stepfather was a drug dealer. The family had a nice home, nice cars, and nice clothes. She stated that the Petitioner was influenced more by his stepfather than his biological father. The Petitioner had told Sandra Bland that he was sorry about the murder and that he did not intend to kill anyone. She stated that she loved the Petitioner.

12. **Toni Bland, cousin.** Toni Bland recalled the Petitioner's home in Germantown. She stated that the Petitioner and his family had nice things. She knew that the Petitioner's stepfather was a drug dealer. She described the Petitioner as "a very nice, kind, loving person" and as "the joker in the family."

13. **Larry Bland, uncle**. Larry Bland stated that the Petitioner expressed remorse over the murder. The Petitioner had told Larry Bland that he did not intend to kill Ontrain Sanders. Larry Bland stated that he loved his nephew.

14. **Jessie Lee Moody, great aunt**. Jessie Lee Moody stated that the Petitioner's stepfather was a "dope dealer." She described the Petitioner as "a very respectable child" and said "that he loved her." Ms. Moody stated that she loved the Petitioner.

15. **Kevin Williams, acquaintance**. Kevin Williams was the person who shot the Petitioner in the legs. He explained that they had gotten into an altercation and that the shooting was a result. After the incident, he asked for the Petitioner's forgiveness, which was given. The two men remained friends after this incident.

During the guilt phase of the Petitioner's trial, the Petitioner's mother and grandmother testified as to his educational history and his history of juvenile arrests. The penalty phase witnesses also testified that the Petitioner was remorseful for his crimes and had not intended to kill the victim. At the post-conviction hearing, trial counsel testified that the Petitioner would not provide them the names of any witnesses. However, Ms. Odell told the Petitioner's family members to come to court and to bring the other family members with them. Ms. Odell conceded that she was aware of the Petitioner's involvement in the sale of illegal drugs and the involvement of the Petitioner's family

in the drug trade. Regardless, counsel attempted to keep this information away from the jury. The Petitioner, however, told the jury himself that he sold drugs. Regarding the information about the Petitioner's stepfather, Ms. Odell stated that she would have wanted to evaluate this information more carefully. In her opinion, she would not have wanted to appear to have been glorifying the drug life. Similarly, Mr. Johnson stated that the defense team wanted to keep any information about the sale of illegal drugs away from the jury. He stated that information that the Petitioner's uncles and stepfather sold drugs would not explain the Petitioner's own involvement in the sale of illegal drugs.

The Petitioner presented the testimony of fifteen potential mitigation witnesses at the post-conviction evidentiary hearing. The testimony of these witnesses can be characterized in several different categories: (1) the Petitioner was surrounded by family members involved in the illegal drug trade; (2) the Petitioner was loved; (3) the Petitioner did not intend to kill Ontrain Sanders; (4) the Petitioner was remorseful of his actions; (5) the Petitioner was a nice young man; (6) the Petitioner lived in a nice neighborhood in Germantown for a period of time; (7) the neighborhood in which the Petitioner lived was crime-ridden; and (8) the Petitioner had twice been the victim of violent crimes.

Some of the evidence at the post-conviction evidentiary hearing was merely cumulative to that evidence which was presented to the jury at the penalty phase of the trial. In this regard, testimony that the Petitioner was loved, that the Petitioner did not intend to kill Ontrain Sanders, that the Petitioner was a nice man, and that the Petitioner was remorseful for his actions, was merely cumulative to evidence already presented. No prejudice resulted from the failure to present more evidence of this same nature.

Many of the witnesses at the post-conviction evidentiary hearing testified that the Petitioner's neighborhood was crime-ridden. Defense counsel did not present any such evidence of the neighborhood environment during the penalty phase. Defense counsel did, however, visit the scene of the murder. Notwithstanding, we cannot determine why trial counsel would not have explored this type of standard mitigation testimony. *See, e.g., State v. Davis*, 872 So.2d 250, 257 (Fla. 2004) (no justification for counsel's failure to explore standard-type mitigation of defendant's family and neighborhood). We do, however, accept Ms. Odell's concern that introducing proof of the family's upscale lifestyle in Germantown as a result of the illegal sale of drugs may not have gone over well with a jury. We cannot conclude that information regarding the Petitioner being pistol whipped and shot would have affected the outcome of the penalty phase. Similarly, we are not able to conclude that evidence that the Petitioner moved from a crime-free neighborhood to one riddled with crime would have affected the outcome of the penalty phase. Again, trial counsel testified that the Petitioner failed to provide them with the names of witnesses. Trial counsel interviewed the Petitioner's mother and grandmother and talked with the Petitioner's uncle. The fact that the Petitioner's family members failed to bring to light evidence of the Petitioner's stepfather's drug dealing, the fact that the family had lived in Germantown, and the impact of two prior crimes against the Petitioner does not render counsel's scope of investigation unreasonable. Even considering all of the mitigation evidence presented at the post-conviction hearing, this court is unable to conclude

that this evidence would have altered the outcome of the trial. The mitigating evidence at the post-conviction hearing would have been subject to impeachment had it been admitted during the penalty phase. The Petitioner's family's history of involvement in the illegal drug trade and their gains and losses from their involvement therein are not inherently mitigating. A jury considering evidence of this nature could view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness. With consideration of the aggravating circumstance relied upon by the State, we cannot conclude that additional mitigating evidence being presented at trial would have resulted in a sentence other than death being imposed. The Petitioner is not entitled to relief on this basis.

### 2. Counsel failed to employ or seek appointment of investigator to interview and investigate witnesses

The Petitioner asserts that counsel's performance fell below the minimum standard of practice for a death penalty case to proceed without the aid of a mitigation expert. There is no *per se* rule requiring defense counsel to retain experts in every capital case. While the United States Supreme Court has adopted standards such as those set forth by the American Bar Association as guidelines for what is reasonable, the Court has repeatedly declined to adopt a rigid checklist of tasks that defense counsel must perform in all cases because "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland,* 466 U.S. at 688-89, 104 S. Ct. at 2065. This fact, coupled with the "constitutionally protected independence of counsel," has resulted in trial counsel being granted broad discretion as to whether the retention of an expert will serve the interests of their clients. *Wiggins,* 539 U.S. at 533, 123 S. Ct. at 2541; *see also Kandies v. Polk,* 385 F.3d 457, 470 (4th Cir. 2004) (vacated on other grounds by 545 U.S. 1137, 125 S. Ct. 2974 (2005)).

As for counsel's failure to retain a mitigating specialist, it is clear that such a witness is not the exclusive means through which defense counsel can thoroughly investigate a petitioner's background. *Kandies,* 385 F.3d at 470. Defense counsel has numerous tools available by which to conduct a background investigation, including lay persons such as family, friends, coworkers, the petitioner, and defense counsel's own experience. *Id.* In the present case, counsel conducted an investigation and developed a mitigation theory to which they adhered. The testimony of the witnesses at the sentencing hearing supported counsel's investigation and development of this theory. Although additional information regarding the Petitioner's family history was presented at the post-conviction hearing, much of that evidence dealt with the fact that the Petitioner was raised in a family immersed in the drug culture. There was no other evidence presented to show how this lifestyle impacted the Petitioner. Moreover, we agree with trial counsel that presentation of this evidence before a jury may have backfired. The United States Supreme Court has unequivocally stated that "what investigation decisions are reasonable depends critically" on "information supplied by the defendant." *Strickland,* 466 U.S. at 691, 104 S. Ct. 2066; *cf. Barnes v. Thompson,* 58 F.3d 971, 979-80 (4th Cir. 1995) (stating that counsel "may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation"). Thus, counsel cannot be faulted for relying upon the assertions of the Petitioner and/or his family members.

In sum, this is not a case in which counsel failed to conduct any inquiry into the accused's background and social history. *See Williams v. Taylor,* 529 U.S. 362, 396, 120 S. Ct. 1495, 1514 (2000). Rather, based on their investigation, trial counsel determined that the best mitigation defense was to show that the Petitioner did not intend to kill the victim and that he was remorseful for his actions. Counsel based this theory upon the information provided by the Petitioner and his family. There was no indication, by either the Petitioner, his grandmother, or his mother, that further investigation into the family history was necessary or would have been fruitful. Regardless of what a different investigation might have uncovered, the Petitioner must first demonstrate that counsel's decision not to investigate further was objectively unreasonable performance. *See Cauthern v. State,* 145 S.W.3d 571, 604 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 2004). The Petitioner has failed to do so. The Petitioner is not entitled to relief as to this issue.

### 3. Counsel failed to request proper jury instructions

#### a. Non-statutory mitigating factors

The Petitioner contends that trial counsel failed to request that non-statutory mitigating factors be charged to the jury. The State responds that the Petitioner has waived this issue by failing to meet the requirements of Rule 10, Rules of the Tennessee Court of Criminal Appeals. In the alternative, the State contends that the trial court specifically charged the jury that they were to consider any and all mitigation that they found existed beyond the enumerated statutory factors.

The Petitioner's claim is without merit. A trial court was "not required to charge the jury on specific non-statutory mitigating circumstances" at the time of this offense and trial. *See Nichols,* 90 S.W.3d at 603 (citing *Cauthern,* 967 S.W.2d at 747). The Petitioner is not entitled to relief on this claim.

#### b. Weighing of aggravating and mitigating factors

The Petitioner similarly contends that trial counsel failed to request a proper jury instruction for the weighing of aggravating and mitigating factors. At the conclusion of the penalty phase, the trial court provided the following instruction:

> Tennessee law provides that no death penalty shall be imposed by a jury but upon a unanimous finding that the [S]tate has proven beyond a reasonable doubt the existence of one or more of the statutory aggravating circumstances.
>
> . . . .
>
> Tennessee law provides that in arriving at the punishment, the jury shall consider as heretofore indicated, any mitigating circumstances . . . .

The trial court also instructed the jury that:

> the defendant does not have the burden of proving mitigating circumstances. If there is some evidence that mitigating circumstances exist, then the burden of proof is upon the [S]tate to prove beyond a reasonable doubt that mitigating circumstances do not exist. There is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance.

The court continued to instruct the jury that they could only impose a death sentence:

> [i]f you unanimously determine that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the [S]tate beyond a reasonable doubt and the said circumstance or circumstances have been proven by the [S]tate to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt.

The trial court further directed the jury in the verdict form to list any aggravating circumstances unanimously found, and the jury was asked to find unanimously whether "the [S]tate has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances . . . outweigh any mitigating circumstances." The jury was instructed that "[t]he verdict must be unanimous and signed by each juror."

The Petitioner complains that the trial court's instruction improperly placed the burden of unanimity in order to give effect to any mitigation offered. The Petitioner asserts that requiring that the jury unanimously find that mitigation outweighs aggravating factors violates the Eighth Amendment under *McClesky v. Kemp*, 481 U.S. 279, 107 S. Ct. 1756 (1987); *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988); and *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227 (1990). Additionally, he argues that the jury instruction impermissibly shifted the appropriate burden by requiring the defense to prove that no mitigating circumstances sufficiently outweighed the statutory aggravating circumstance in order to deliver a punishment other than death. Finally, the Petitioner states that the instruction impermissibly lessened the burden of the State to prove the aggravating factors.

The record does not support the Petitioner's claims. The jury was fully informed that it could only impose a death sentence if the State proved an aggravating factor beyond a reasonable doubt by unanimous decision of the jury and if the State proved that such aggravating factor outweighed any mitigating factors beyond a reasonable doubt by unanimous decision of the jury.

      **c.**      **Counsel failed to object to instruction which amounted to an improper judicial comment upon the evidence**

-64-

*The contested instruction provides:*

Mitigating circumstances. Tennessee law provides that in arriving at punishment, the jury shall consider as heretofore indicated, any mitigating circumstances which shall include, but not be limited to, the following:

> 1. The defendant has no significant history of prior criminal activity. Conviction of **the crime of theft of an automobile or assault** is not an aggravated circumstance to be considered in determining the penalty, but a conviction of that crime may be considered in determining whether or not the defendant has a significant history of prior criminal history.

(Emphasis added). The Petitioner complains that this instruction improperly comments upon the evidence and orders the jury to consider the past crimes of the defendant, specifically naming the juvenile crimes. The Petitioner contends that, had counsel objected to this improper charge, there is a reasonable probability the verdict on sentencing would be different.

The challenged instruction was a correct statement of the law. Furthermore, the instruction was supported by the evidence introduced during the penalty phase. The Tennessee Constitution, of course, prohibits judges from making any comment "with regard to matters of fact." Tenn. Const. art. VI, § 9; *State v. Suttles,* 767 S.W.2d 403, 406 (Tenn. 1989). The aim of this rule is to avoid giving "the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles,* 767 S.W.2d at 407; *State v. Brown,* 823 S.W.2d 576 (Tenn. Crim. App. 1991). "It is natural that jurors should be anxious to know the mind of the court and follow it. Therefore, a court cannot be too cautious in his inquiries." *McDonald v. State*, 14 S.W. 487, 488 (Tenn. 1890). In the present case, the charge did not amount to a comment upon the evidence. The record does not contain any indication of the trial court's opinion of the evidence. Rather, the instruction cautioned the jury that it was not to consider any of the crimes of the Petitioner against him as an aggravating circumstance. The Petitioner is not entitled to relief on this issue.

### 4.     Counsel failed to inspect and/or object to the jury verdict

The Petitioner next contends that trial counsel was ineffective for failing to inspect and/or challenge the "highly ambiguous verdict form." The Petitioner complains that the verdict form and verdict were constitutionally invalid. In the section of the verdict form that notes the aggravating circumstances the jury unanimously found, the jury listed: (1) "cruel" and (2) "torture." Citing Tennessee Code Annotated section 39-13-204(i), the Petitioner contends that the appropriate format for a jury to report any finding of an aggravating circumstance is for it to do so in the language of the statute so that there can be no mistake.

On direct appeal, the Tennessee Supreme Court addressed the verdict form, concluding:

The specific finding of the jury in this case was that the murder was "1. cruel 2. torture." Indeed, the State did not rely upon the "serious physical abuse" prong of the statute. The failure of the verdict to repeat the language of the statute defining the aggravating circumstance does not invalidate the jury's findings. *See State v. Henley,* 774 S.W.2d 908, 917 (Tenn. 1989) (upholding verdict of "atrocious, cruel, torture"); *see also State v. Teel,* 793 S.W.2d 236, 250 (Tenn. 1990).

*Bland,* 958 S.W.2d at 661 n.6. As the Tennessee Supreme Court has found no error in the verdict form, the Petitioner is not entitled to post-conviction relief as to this claim.

### D.      Appellate deficiencies

The Petitioner complains that counsel failed to raise the following issues on appeal:

1.       Counsel failed to challenge the jury instruction on the burden of proof;
2.       Counsel failed to challenge the jury instruction for deliberation in the first degree murder charge;
3.       Counsel failed to challenge the jury instruction for the offense of negligent homicide;
4.       Counsel failed to challenge jury instruction for defense of ignorance or mistake of fact;
5.       Counsel failed to request proper instruction for weighing of aggravators and mitigators; and
6.       Counsel failed to challenge the penalty phase jury verdict.

The Petitioner complains that counsel failed to raise numerous issues on appeal, including challenges to jury instructions and to the jury verdict. The same principles apply in determining the effectiveness of both trial and appellate counsel. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court. *See, e.g., Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764 (2000); *Aparico v. Artuz*, 269 F.3d 78, 95 (2nd Cir. 2001); *Mayo v. Henderson*, 13 F.3d 528, 533-34 (2nd Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583 (1986)). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. *Id.* Likewise, unless the omitted issue has some merit, the Petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. *Id.* When an omitted issue is without merit, the Petitioner cannot prevail on an ineffective assistance of counsel claim. *Carpenter,* 126 S.W.3d at 888 (citation omitted). Additionally, ineffectiveness

-66-

is very rarely found in cases where a petitioner asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

The Petitioner's challenges to appellate counsel's failure to raise certain issues on appeal, *i.e.,* (1) challenge to jury instruction on reasonable doubt; (2) challenge to jury instruction on deliberation; (3) challenge to failure to instruct jury on ignorance or mistake of fact; (4) challenge to failure to instruct jury on negligent homicide; (5) challenge to jury instruction on weighing of aggravating and mitigating factors; and (6) challenge to jury verdict form, have been discussed *supra*. This court has concluded that the Petitioner has failed to establish that he was prejudiced by counsel's failure to request or challenge the jury instructions and the jury verdict form. Similarly, we cannot conclude that the Petitioner was prejudiced by counsel's failure to raise these same issues on appeal. The Petitioner is not entitled to relief on this claim.

## CONCLUSION

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that the Petitioner has failed to prove the allegations contained in his post-conviction petition by clear and convincing evidence. The post-conviction court properly denied the Petitioner relief. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE